Jonathan NOBLES, Appellant,

v.

The STATE of Texas, Appellee.

No. 69991.

Court of Criminal Appeals of Texas,
En Banc.

June 10, 1992.

Rehearing Denied Oct. 14, 1992.

Walter C. Prentice (court appointed on appeal only), Austin, for appellant.

Ronald Earle, Dist. Atty., and Philip A. Nelson, Jr., Asst. Dist. Atty., Austin, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

MILLER, Judge.

Appellant was convicted of capital murder. V.T.C.A. Penal Code, § 19.03(a)(2). Following the jury's return of affirmative answers to the submitted special issues[1], the trial judge then assessed the required punishment of death by lethal injection. Appellant presents eight points of error in his direct appeal. We will affirm the judgment of the trial court.

Appellant does not challenge the sufficiency of the evidence either to support his conviction or to support the jury's affirmative answers to the special issues. Rather, appellant asserts various challenges to the trial court's rulings during *voir dire* and both phases of his trial. As a result, we will initially dispense with a recitation of the facts in this case.

## I.

### Mitigation Issues

In his first point of error, appellant claims that the trial court erred in declining to allow him to submit jury charges on the mitigating quality of evidence he had proffered on his abused childhood and drug use. Appellant contends that the special issues then in effect[2] were insufficient in that they precluded the jury from hearing or giving effect to the mitigating evidence he offered, and that there-

fore the Texas capital punishment scheme was unconstitutional as it applied to him. *Penry v. Lynaugh*, 492 U.S. 302, 319–328, 109 S.Ct. 2934, 2947–2952, 106 L.Ed.2d 256, 278–284 (1989). In the oft cited case of *Penry*, Justice O'Connor wrote for the majority that the Texas scheme as applied to Penry, a man of low intellect, was incapable of allowing the jury to express its "reasoned *moral* response to the defendant's background, character, and crime." *Id.* at 319, 109 S.Ct. at 2947 (citing *California v. Brown*, 479 U.S. 538, 545, 107 S.Ct. 837, 841, 93 L.Ed.2d 934, 942 (1987) (O'Connor, J., concurring)) (emphasis in original). The jury, in deciding the fate of an individual, must be allowed to give consideration to society's belief that some individuals are less culpable for their actions than others. *California v. Brown*, 479 U.S. at 545, 107 S.Ct. at 841 (O'Connor, J., concurring). The problem with our former Article 37.071 lay in its inability to fully allow, in some instances, the jurors to apply their "reasoned moral response" by answering no to a special issue. This was due to the conflict created in applying special issues one and two.[3]

At the punishment phase of the trial, appellant called three witnesses familiar with his childhood. First, appellant's foster sister (who had lived in his natural mother's household) testified that appellant "was beaten" with a "big, thick belt[ ]", that he was "mistreated, neglected, [and] ignored[ ]" by his stepfather, and that he

---

1. Tex.Code Crim.Proc.Ann art. 37.071(b) 1–2; fn. 3, *infra.*

2. Since Nobles' trial, Article 37.071 has been amended by the 72nd Legislature. Tex.Code Crim.Proc.Ann. art. 37.071 (Vernon supp.1991).

3. The pre-*Penry* Article 37.071 required jurors to answer three special issues, a "no" response on any of which would result in the trial judge imposing a life sentence rather than the death penalty. That Article read as follows:

    \* \* \* \* \* \*

    (b) On conclusion of the presentation of the evidence, the court shall submit the following three issues to the jury:
    (1) whether the conduct of the defendant was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

    (2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and
    (3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

    \* \* \* \* \* \*

    Tex.Code Crim.Proc.Ann art. 37.071 (Vernon supp. 1986). Trial counsel, in seeking to present evidence showing that a defendant's moral blameworthiness was low, simultaneously presented evidence indicating that the defendant would continue to be a threat to society. This was the "two edged sword" Justice O'Connor referred to while invalidating Penry's conviction. *Penry,* 492 U.S. at 324, 109 S.Ct. at 2949.

was "locked ... up in the closet one time."[4] Second, an uncle testified that appellant was a hyperactive child, that appellant's mother had given him "several beatings" for his misbehavior and that "he had bruises all over him most of the time", some of which were bloody. The uncle also testified that appellant's stepfather had "placed [him] in a closet several times as punishment" for "[a]nywhere from an hour to three or four hours at a time." Last, appellant put his foster mother on the witness stand who testified that he had come "from an abused home[ ]," but that of the seventeen children she had foster parented, he was the best "all around." Further, she stated that he adjusted well, was not hostile, and was very loving.

On several prior occasions, this Court has considered whether the special issues allow a jury to give mitigating effect to evidence of an abused background.[5] Most recently, this Court held that where the evidence presented by defendant's witnesses failed to show a connection between the events they described and the commission of the crime, then that "evidence is not relevant, *beyond the scope of the special issues*, to the jury's individualized assessment of Appellant's moral culpability for the crime." *Goss v. State*, 826 S.W.2d 162, 166 (Tex.Crim.App.1992) (emphasis in original). There, Goss introduced the testimony of his sister and a childhood friend which provided evidence of a troubled childhood, to-wit: they related that on several occasions he had been "beaten with a shoe, belt and wooden slat[,]" and he "did not know his mother until late in his development." *Id.* However, "[n]one of the evidence presented by appellant's witnesses sought to explain the connection between the apparently isolated problems of childhood and the commission of the crime." *Id.* With-

out such a connection, the evidence offered was not helpful to the jurors' determination of the appellant's moral blameworthiness.

Applying the principle espoused in *Goss*, the evidence presented in the cause *sub judice* is likewise not relevant beyond the scope of the special issues. Evidence of the appellant's unfortunate childhood was not, without some testimony indicating a nexus between his childhood circumstances and the commission of the crime, helpful to the jury's consideration of the special issues or indicative of a lessened moral blameworthiness. In fact, the evidence appellant chose to present tends to show that the abuse appellant received was sporadic and isolated, not of a continuing nature. Indeed, testimony revealed that attempts were made to place appellant in a safe and nurturing environment once evidence of his less than model home-life became apparent. As such, the evidence he offered was sufficiently encompassed within the scope of the special issues and no special jury charge was required.

▪ Additionally in point of error one, appellant claims that he was entitled to a special jury instruction regarding the potential mitigating quality of being intoxicated at the time of the offense. During questioning at the guilt phase of the trial, appellant's girlfriend told of his use of drugs both prior to and on the night of the crime. That testimony revealed that the appellant had used drugs in her presence on many occasions, including the night of the murders. Although she stated that "[h]e didn't tell [her] when he would use them[,]" she did testify that she "occasionally" saw methamphetamine in his attaché case, and that it appeared that he was "shooting" these drugs because she saw needles in his case and "track marks on his arm."[6] When asked about the types and

---

4. Further questioning indicated that the witness did not know why appellant was so confined, but that she did recall that the closet was somehow connected to a bathroom.

5. *Moody v. State*, 827 S.W.2d 875, 896 (Tex. Crim.App.1992) (evidence of the handcuffing of defendant during childhood was not *"Penry* evidence"); *Lewis v. State*, 815 S.W.2d 560, 567 (Tex.Crim.App.1991) (testimony of grandmother

that she "sometimes saw bruises" on the defendant did not raise a bona fide issue regarding mitigation); *Treviño v. State*, 815 S.W.2d 592 (Tex.Crim.App.1991) (evidence of a "disruptive family" or a "tragic family life" addressed within the scope of the special issues).

6. Testimony indicated that the term "track marks" is the vernacular street phrase describ-

quantities of drugs appellant had used on the night of the murders, she spoke of a combination of a brown colored liquid (she assumed was methamphetamine [7]), cocaine, marijuana and alcohol. However, further questioning revealed that she had no actual knowledge that he had *used* any of the above-mentioned drugs.[8]

The jury, at the punishment phase of appellant's trial, again heard testimony of his alleged drug use. At that proceeding, the defense offered the testimony of three witnesses who claimed to know of his drug abuse, *viz:* two ministers, and a police officer. Appellant's minister related that he first came to know the appellant during a telephone conversation regarding his recent release from prison ánd his desire "to reorient into society." [9] The two subsequently met and appellant attended a religious service; their next contact was some three to three and a half months later. At that time, appellant "realized that he was deviating spiritually[,] ... [t]hat he was becoming involved on [sic] drugs[ ]", and that "he wanted to probably ... get right with the lord[,] ... so [they] had intense prayer in [the minister's] office." A later

appointment was made by the two to meet to discuss the appellant's possible entry into a drug rehabilitation program, but the minister was late and no meeting occurred. That was "on the Friday before the indicent [sic] of the murder." Later that day, the minister went to the appellant's residence, observed that there was nothing unusual about his appearance and appellant told him he felt "alright" and did not need the program. The next day, the appellant called the minister to confess his guilt. He also indicated that he was "making a tape ... for the police department ... [to] present[ ] before high school students and all to show them the harms of drugs." [10]

Although enlightening as to the appellant's propensity to use drugs, the foregoing testimony was not useful to the jury's consideration of appellant's deathworthiness. This Court has considered the impact of drugs as they relate to the special issues, and, unless a direct correlation can be drawn between the use of the drugs and a defendant's aberrational behavior, we have determined that such usage is fully encompassed within the scope of Article 37.071.[11] The evidence appellant's witness-

---

ing bruising that develops after a needle pierces and breaks a vein.

7. The witness indicated that she assumed this was "speed" (methamphetamine) despite the irregular color. It would seem that the witness was familiar with "speed" taking the form of a clear liquid, and, for this reason, she could not be certain that it was the alleged drug.

8. Cross-examination of the witness produced testimony that the appellant had not "ingested drugs in front of [her] [,]" but that her personal observation of the appellant was consistent with her past experience of seeing him in a state of "paranoia, frustration, anger, [and] mood swings." This, she said, made it "obvious to her that he had used something."

9. The minister's testimony does not reveal when the appellant was released from prison, and the trial transcript simply contains a document entitled "State's Notice of Other Crimes, Wrongs and Acts", a list of several prior criminal proceedings against appellant, each of which charges burglary or theft. Further, the transcript provides no information regarding the status, dates or even type of proceedings surrounding the several charges. Thus, it is unclear from the record to what the witness's vague statement was referring.

10. Thereafter, appellant called the assistant pastor of his church to the witness stand. The questions asked and responses given were virtually identical to that of the church pastor, and will not be reproduced here. A sergeant from the Austin Police Department's Homicide Division was also called by the appellant to give testimony regarding appellant's voluntary request to make the previously mentioned video on the negative effects of drugs. Likewise, the substance of that testimony will not be repeated.

11. *Ex parte Kelly,* 832 S.W.2d 44, 47 (Tex.Crim. App.1992) (evidence presented that appellant was under the influence of drugs at the time of offense is encompassed within the scope of the special issues); *Miniel v. State,* 831 S.W.2d 310, 321 (Tex.Crim.App.1992) (voluntary intoxication is not *Penry* evidence because it is answerable within the scope of the special issues); *Moody v. State, supra* (evidence of defendant's development of a drug and alcohol problem at age 16 and his subsequent commission to a mental institution for drug and alcohol treatment was not "*Penry* evidence"); *Ex parte Ellis,* 810 S.W.2d 208, 211–212 (Tex.Crim.App.1991) (drug abuse, addiction and voluntary intoxication at the time of the offense did not "rise to the level of *Penry* evidence"); *cf. Gribble v. State,* 808 S.W.2d 65 (Tex.Crim.App.1990) (evidence pre-

es provided amply suggests that he had a drug problem. Nonetheless, there is no evidence that drugs produced in the appellant such uncontrollable impulses as to render him less able to distinguish right from wrong or to learn from his mistakes and, therefore, less deathworthy; indeed, there is no proof that appellant was actually under the influence of drugs during the crime's commission. Without more, we cannot say that appellant was entitled to a special instruction on mitigation. Appellant's point of error number one is overruled.

## II.

■ In point of error number two, appellant submits that the interaction of subsections d, e, and g of Article 37.071 is unconstitutional in that they force the trial court "to impart inaccurate and misleading information that minimizes the importance of the jurors' deliberation and undermines the reliability of the death penalty." Appellant's Br. at 36. As we understand appellant's argument, this interaction could possibly induce a juror, who is wavering between a "yes" and "no" vote, to vote "yes" in order that a jury deadlock is avoided. Such a vote, appellant argues, indicates an impermissible lessening of the individual juror's deliberative function, and is thus violative of appellant's rights under the Eighth and Fourteenth Amendments to the United States Constitution, and Article I, §§ 13 & 19 of the Texas Constitution.

This Court, in *Davis v. State*, 782 S.W.2d 211 (Tex.Crim.App.1989), *cert. denied*, 495 U.S. 940, 110 S.Ct. 2193, 109 L.Ed.2d. 520 (1990), has reviewed a virtually identical claim. We quote liberally from Presiding Judge McCormick's dispensation of the issue in that case:

The jury in a capital murder case is responsible for answering questions the result of which will determine the life or death of an individual. Any information that is given the jury which may be interpreted by it as relieving that responsibili-

ty is considered an infraction upon the jury's fact finding function. See, e.g., *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (jurors improperly told that their decision was "reviewable"). In rejecting the same challenge made by appellant in this case, the United States District Court for the Eastern District of North Carolina observed:

"Petitioner contends that a juror who conscientiously believes that the evidence called for a life sentence might nevertheless vote for the death penalty in order to avoid mistakenly assumed consequences of jury deadlock. Although this scenario is plausible, so is the converse possibility that a juror convinced of the appropriateness of a life sentence would refuse to consider the evidence and the views of other jurors in support of the death penalty, knowing that his blind obstinance would perforce result in a life sentence. Neither scenario results in a 'reliable' or desirable process of deliberation, but the court cannot say that the first scenario is significantly likely to occur as a result of not giving the instruction than is the second as a result of giving it." *Barfield v. Harris*, 540 F.Supp. 451, 472 n. 17 (E.D.N.C. 1982) affirmed, 719 F.2d 58 (4th Cir. 1983) cert. denied, 467 U.S. 1210, 104 S.Ct. 2401, 81 L.Ed.2d 357 (1984).

At least two State appellate courts agree with the *Harris* opinion. In *Justus v. Commonwealth*, 220 Va. 971, 266 S.E.2d 87 (1980), the Supreme Court of Virginia observed that informing the jury that its failure to agree would result in a life sentence would have been an "open invitation for the jury to avoid its responsibility and to disagree." 220 Va. 971, 266 S.E.2d at 92. Subsequent to *Justus*, the North Carolina Supreme Court has joined the Virginia Supreme Court in rejecting the same arguments advanced by appellant in this case. *State v. Smith*, 305 N.C. 691, 292 S.E.2d 264, 276 (1982). We

sented of childhood sexual abuse, either imagined or real, and the effect of the true psychosis which occurred when appellant's sexual fanta-

sies were combined with alcohol or drugs, tended to lessen his culpability and required a special instruction on mitigation).

agree with the holdings of both State Supreme Courts. Additionally, we fail to see any relevance in informing the jurors the result of their failure to agree; this information has no pertinence to the special issues that are submitted to a jury in a capital murder case. [Cites therein omitted]. While the information represents a correct statement of the law, it concerns a procedural matter and is not the proper subject of an instruction by the trial court or comment upon by the litigants. [Cites therein omitted]. Therefore, we hold that Article 37.071(g) did not work to deprive appellant of his due process rights and, as such, the trial court did not err when it refused to either instruct the jury or allow appellant the opportunity to inform the jury that its failure to decide the special issues would automatically result in imposition of a life sentence.

*Davis* at 221–222; *See also Sterling v. State*, 830 S.W.2d 114, 122 (Tex.Crim.App. 1992) (citing *Davis* ).[12]

After extensive review of the record, we were unable to find any misleading deviations, by counsel or the trial court, from the language of Article 37.071; in fact, the record is replete with instances in which counsel for both the State and the defense correctly informed the jurors, individually and collectively, of the application of the statute. The Texas death penalty statute has previously been held to be valid. *Jurek v. State*, 522 S.W.2d 934 (Tex.Crim. App.1975), *aff'd sub nom. Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). "If discretion in the assessment of punishment under a statute can be shown to be reasonable and controlled, rather than capricious and discriminatory, the test of *Furman* [13] will be met." *Id.* at 940. Agreeing with our assessment of the statute, the Supreme Court wrote that "[b]ecause [the Texas] system serves to assure that sentences of death will not be 'wantonly' or 'freakishly' imposed, it does not violate the Constitution." *Jurek v. Texas*, 428 U.S. at 276, 96 S.Ct. at 2958. Therefore, because the Texas statute is valid, and because we also find that the instructions given to the jury complied with the statute and were within the framework announced in *Davis*, appellant's second point of error is overruled.[14]

### III.

■ Appellant's third point of error in many respects mirrors his second. Once again he claims that the interaction of subsections d, e, and g of Article 37.071 work a violation of his constitutional rights, however he formulates this claim with the additional assertion that the article

mandates the trial court to mislead the jurors as to the effect of their individual vote on the special issues. This mandatory subtrofuse [sic] violates the Eighth and Fourteenth Amendments to the United States Constitution and Art. 1, Sections 13 and 19 of the Texas Constitution, in that is [sic] depreciates his statutory right to a sentence less than death.

---

**12.** Since the author prepared this opinion, we have again discussed the effect of not informing jurors of their failure to reach a permitted answer to a special issue, and have determined that, based upon what is usually told to the panel-members at *voir dire*, jurors are capable of surmising Article 37.071's mandated outcome. *Draughon v. State*, 831 S.W.2d 331, 337–38 (Tex.Crim.App.1992). Noting that danger lies primarily in trivializing the importance of their decision, there is, thus, "no apparent constitutional inhibition to concealing [the effect of their vote] from jurors …, so long as they are not misled into believing that ultimate responsibility for the verdict rests elsewhere." *Id.* at 337–38 (comparatively citing *Davis, supra,* at 221–222).

**13.** *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (upholding death penalty where statute under which it is applied is properly drawn).

**14.** It should be noted that appellant also suggests that his "conviction should be reversed and a new trial ordered[ ]" (pursuant to Tex. R.App.Proc. 81(b)(2)) because "there was an 'unacceptable risk that the death sentence may have been meted out … through whim or mistake.'" (Quoting from *Caldwell v. Mississippi, supra* ). Having previously decided that there is no conflict presented by the interaction of the various subsections, and therefore no error, that portion of appellant's argument is moot and such analysis is unnecessary.

Appellant's Br. at 40. The Texas system prevents, appellant urges, a "marginal juror who believes one of the special issues is 'no' ... [from] hold[ing] out much longer if he knew his lone vote was determinative of the ultimate result of the case." *Id.* at 42. This somehow means that "each juror would weigh his or her vote more heavily in the face of the responsibility of 'his' individual vote." *Id.* We believe this argument misconstrues not only the purpose of the mechanics of Article 37.071, but also the role of the individual juror.

Our statute allows a jury to be informed that twelve jurors must vote "yes" on each special issue in order for the trial judge to impose the death penalty, but that ten jurors are required to answer "no" to any given special issue; a jury is not told of the effect of their potential inability to agree on a submitted issue. *See* TEX.CODE CRIM. PROC.ANN. art. 37.071 (Vernon supp.1986). It is the role of a juror to simply answer the special issues either "yes" or "no," and nothing else. Conversely, it is not the role of the individual juror to skirt this responsibility by failing to return a vote. The issues are framed in a manner which permits them to be answered either affirmatively or negatively, and it is the purpose of the deliberative process to resolve juror vacillation. Upon individual questioning during *voir dire*, each juror indicated an ability to follow the law and to act as a fact finder. This included the responsibility to vote "no" to a special issue if the evidence so required, even if this meant that their's was the "lone vote." A juror who is unsatisfied that the answer to a special issue is "yes" is duty bound to vote "no," and it is therefore not necessary, nor indeed helpful,

to inform the jury of the result of a failure to reach a statutorily permitted juror combination.[15]

Furthermore, Article 37.071 cannot take away that which has not been given. Appellant is not entitled to a sentence of less than death: the statute merely operates in such a fashion that, having returned a verdict of guilty in the guilt/innocence phase of the trial, a punishment of *at least* life imprisonment will then be required. The "ultimate penalty" is reserved for those few incorrigibles that pose such a great threat to society that they cannot be incarcerated without fear of further violent outbursts toward others, and it is that future probability that a jury is called on to decide. A defendant whom a jury has unanimously found to present a great danger to society is not entitled to life imprisonment, even though that sentence *may* have been imposed. We thus hold that appellant was not statutorily entitled to a sentence less than death, and appellant's third point of error is overruled.

## IV.

Appellant's fourth point of error challenges the trial court's refusal to submit his requested jury charge on the lesser included offense of voluntary manslaughter. Our Penal Code describes voluntary manslaughter in the following manner:

### § 19.04. Voluntary Manslaughter

(a) A person commits an offense if he causes the death of an individual under circumstances that would constitute murder under Section 19.02 of this code,[16] *except that he caused the death under*

---

**15.** The assumption that a juror would more seriously deliberate the special issues if given this additional information, as appellant makes *ante,* is flawed. On the contrary, it is just as likely that a juror would, in avoiding reaching a difficult decision by not voting, *less* seriously deliberate on the special issues.

**16.** Section 19.02 provides:
(a) A person commits an offense if he:
(1) intentionally or knowingly causes the death of an individual;
(2) intends to cause serious bodily injury and commits an act clearly dangerous to hu-

man life that causes the death of an individual; or
(3) commits or attempts to commit a felony, other than voluntary or involuntary manslaughter, and in the course of and in furtherance of the commission or attempt, or in the immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

\*   \*   \*   \*   \*   \*

TEX.PENAL CODE ANN. § 19.02 (Vernon 1974).

*immediate influence of sudden passion arising from adequate cause.*

(b) "Sudden passion" means passion *directly caused by the individual killed or another acting with the person killed* which passion arises at the time of the offense and is not solely the result of former provocation.

(c) "Adequate cause" means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection.

\* \* \* \* \* \*

TEX. PENAL CODE ANN. § 19.04 (Vernon 1974) (emphasis added). Voluntary manslaughter is a lesser included offense of murder and, therefore, capital murder. *See generally Brooks v. State,* 548 S.W.2d 680, 683 (Tex.Crim.App.1977); *Sattiewhite v. State,* 786 S.W.2d 271, 278 (Tex.Crim. App.1989), *cert. denied,* 498 U.S. 881, 111 S.Ct. 226, 112 L.Ed.2d 181 (1990) (citing *Brooks* ).

In *Royster v. State,* we proposed a two-step analysis for determining whether a trial court has erred in not submitting a charge on a lesser included offense. 622 S.W.2d 442, 446 (Tex.Crim.App.1981) (on Court's Motion for Rehearing) (plurality). We adopted the *Royster* test in *Aguilar v. State,* 682 S.W.2d 556 (Tex.Crim.App.1985). The first prong of that test requires "the lesser included offense [to] be included within the proof necessary to establish the offense charged." *Royster,* at 446. The second prong requires that "there must be some evidence in the record that if the defendant is guilty, he is guilty of only the lesser offense." *Id.* Appellant has satisfied the first prong of the *Royster* test.

Nevertheless, the simple fact that voluntary manslaughter is a lesser included offense of murder (and therefore capital murder[17]) does not, in every case, lead to the conclusion that a jury instruction must be given. *Sattiewhite, supra; cf. Saunders v. State,* 840 S.W.2d 390, 393 (Tex. Crim.App.1992) (evidence fit the *Royster*

test and required a charge on the lesser included offense of criminally negligent homicide). Judge Davis' discussion, in *Sattiewhite,* of the trial court's failure to allow a charge there has application here:

In the determination whether the evidence was sufficient to warrant a jury charge on voluntary manslaughter, this Court must consider all relevant facts and circumstances. It is not enough that appellant acted mad or upset, the evidence must also show that the anger was the result of an act of provocation on the part of the deceased or a third party acting in concert with the deceased. *Marquez [v. State,* 725 S.W.2d 217, 224 (Tex.Crim.App.1987), *cert. denied,* 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987) ]; *See Lincecum v. State,* 736 S.W.2d 673 (Tex.Cr.App.1987) *cert. denied* 486 U.S. 1061, 108 S.Ct. 2835, 100 L.Ed.2d 936 (1988). In cases where this Court has held the evidence was sufficient to warrant such a charge, a distinguishing factor tends to be that the deceased and the appellant had engaged in some sort of altercation or argument which immediately escalated into a killing. *See Humphries v. State,* 615 S.W.2d 737 (Tex.Cr.App.1981) (stabbing in the course of a heated argument); *Schoelman v. State,* 644 S.W.2d 727 (Tex.Cr.App.1983) (shooting after an argument over a ring). However, this Court has distinguished cases where the passion was not sudden. *Hobson [v. State,* 644 S.W.2d 473 (Tex.Crim.App. 1983) ], supra. (Charge on voluntary manslaughter not warranted where altercation took place in the morning and the stabbing took place in the evening.) *Jenkins v. State,* 740 S.W.2d 435 (Tex.Cr. App.1983). (Killing resulted after highway chase and altercation; defendant not entitled to a charge on voluntary manslaughter because fear alone is not enough to raise sudden passion.)

786 S.W.2d at 289.

In the cause *sub judice,* Ron Ross, the boyfriend of one of the victims, testified that he had taken Mitzi Johnson Nalley out

---

17. *Jones v. State,* 833 S.W.2d 118, 127 (Tex.Crim.    App.1992).

for a birthday dinner at approximately 7:30 P.M., and had returned at approximately 1:30 A.M. He stated that the doors and windows were locked at 2:30 A.M. when he and Nalley went to bed, and that he did not awake again until he heard Nalley screaming his name. Ross continued his testimony by relating that he ran into Kelly Farquhar's bedroom, saw the appellant stabbing Nalley, began to fight with the appellant and was stabbed repeatedly. After escaping from the crime scene, he collapsed in the street and was later revived by EMS personnel. Eventually, he "clearly identified Appellant as the man who stabbed him, Mitzi Johnson Nalley and Kelly Farquhar." Appellant's Br. at 18.

Germane to this point of error, appellant points us to several parts of the record which he alleges provide some evidence that he is guilty of only the lesser offense of voluntary manslaughter. Testimony from two witnesses shows, appellant contends, that he was "acting in response to sudden passion from an adequate cause exacerbated by his mental state and drug abuse...." Appellant's Br. at 45. However, nothing in the record supports appellant's contention because the evidence proffered is wholly unrelated to the crime committed. Evidence provided by the two witnesses suggests that appellant may have been in a general state of anger or frustration. Nonetheless, there is no evidence showing that his victims created this state. Additionally, appellant's anxiety level, according to one of the witnesses, had been high for at least *several months*. As there is no evidence indicating that the victims produced in appellant the requisite sudden passion (nor even that the passion, if any, arose during the commission of the crime), the trial court did not err in denying the requested charge. Appellant's fourth point of error is overruled.

## V.

In point of error five, appellant maintains that the trial court committed error when he allowed the prosecution to present certain portions of the testimony of Dr. Harvey Renger. As previously mentioned, on the morning of the murders Ron Ross was also attacked by appellant. Renger, on emergency room duty, treated the severe wounds Ross suffered at the hands of appellant, and he later testified at trial as to the efforts he undertook in saving Ross's life. Appellant made no objection to the Doctor's testimony regarding the nature and extent of the injuries inflicted, but he did object to any mention of "the medical and surgical procedures that were necessary in treating Ross[ ]", specifically, the admission of testimony regarding the surgical procedures used to repair stab wounds and to later remove Ross's right eye. Appellant's Br. at 46. His objection was overruled, and he claims that the testimony was irrelevant and prejudicial.

While evidence of the nature complained of could, under some circumstances, be considered extraneous and improper, that is not true in the present situation. The Grand Jury of Travis County returned an indictment which alleged, in pertinent part, that

\*　　\*　　\*　　\*　　\*　　\*

Jonathan Nobles *in the course of committing and attempting to commit burglary of a habitation and building* owned by Mitzi Johnson Nalley, he, the said Jonathan Nobles did then and there intentionally commit murder by causing the death of an individual, Mitzi Johnson Nalley, by cutting and stabbing the said Mitzi Johnson Nalley with a knife,

Tr. at 3 (emphasis added). The jury returned a verdict of guilty based on this theory, therefore burglary was the felonious conduct undergirding the capital murder conviction. *See* Tex. Penal Code Ann. § 19.03(a)(2) (Vernon supp.1985).

Burglary occurs when a person "enters a building or habitation and commits or attempts to commit a felony or theft." *Id.* § 30.02(a)(3). In this case, the proved underlying felony was the aggravated assault committed upon Ross. Appellant's assault on Ross, in order to be considered aggravated and, therefore, felonious, required proof of an aggravating element, e.g.: the infliction of serious bodily injury. *Id.* § 22.02. " 'Serious bodily injury' means

bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 1.07(a)(34). Proof of the injuries inflicted during an assaultive episode are relevant to show serious bodily injury.[18]

In the instant case, the testimony provided by Dr. Renger largely amounted to descriptions of the wounds inflicted on Ron Ross. At one point, Renger testified that in conducting a laparotomy[19] he discovered (and repaired) a laceration in Ross's diaphragm which had caused his stomach to move into the muscle and emit gastric fluids. He also testified that a vascular surgeon had repaired a major artery in the victim's neck, and that an ophthamologist had removed his eye following the stabilization of his condition. The few references to procedures used were either necessary to describe how the injuries were discovered, to inform the jury as to their extent or to indicate whether they were life threatening. Thus, the testimony was relevant as to the seriousness of the assault upon Ross, and, hence, appellant's felonious intent, and the trial judge did not err in admitting it. Appellant's fifth point of error is overruled.

## VI.

■ Point of error six challenges the failure of the trial judge to grant a mistrial following a witness's reference to an extraneous offense. The statement complained of came during direct questioning of John Bruce Smith (during the trial on the merits), a witness for the State who had seen appellant soon after the commission of the murders. Having testified that the witness's roommate and appellant had shown him a four-inch gash on appellant's fore-

arm, Smith was asked: "What happened *after you looked at the wound?*" The following exchange then took place:

A I told him, you know, I didn't want—I told him, you know, that he should go to the hospital. And he told me he didn't want to go to the hospital *because he didn't want to go back to prison* [emphasis added]. And I asked him what happened. He said he got in a fight with a black guy, and the guy cut him, and he beat him up.

MR. BRITTAIN [Defense Counsel]: Your Honor, I'm going to object to the hearsay nature of this and take up a matter of law.

THE COURT: That will be overruled.

MR. BRITTAIN: We need to take up a matter of law, Your Honor.

THE COURT: Ladies and gentlemen of the jury, you'll recess to the jury room. Keep in mind the instructions I've given you.

(Jury out.)

\* \* \* \* \* \*

MR. BRITTAIN: The reason we make a Motion in Limine, Your Honor, is not only—we assume that the State's attorneys will be professional in their conduct and not elicit information concerning prior criminal record of the defendant during the guilt-innocence stage of the trial, which is clearly not admissible, highly prejudicial, but they will also, as the Motion in Limine refers to, prevent witnesses from doing the same. And these witnesses are to be instructed—and the Court has granted this motion with respect to number two—that they are not to in any way elicit information concerning the prior criminal record.

---

18. *Fancher v. State,* 659 S.W.2d 836, 837 (Tex. Crim.App.1983) (evidence of CATSCAN, vaginal surgery and stitches properly admitted to show serious bodily injury); *Payne v. State,* 596 S.W.2d 911, 915 (Tex.Crim.App.1980) (evidence of tube thoracostomy, blood transfusions and removal of bullet near spine properly admitted to establish serious bodily injury); *Hart v. State,* 581 S.W.2d 675 (Tex.Crim.App.1979) (evidence of repair of stab wounds and stitches properly admitted to show knife capable of inflicting

serious bodily injury); *Martinez v. State,* 699 S.W.2d 910 (Tex.App.—Amarillo 1985, no pet.) (evidence of exploratory surgery revealing spleen and abdomen properly admitted to show knife used as a deadly weapon).

19. According to the Doctor, a laparotomy is a "fancy word for opening the abdomen and looking around and *seeing what's wrong.*"

"Back to prison" is about as clear a statement of that type in response to communications specifically called for by the district attorney. The question is asking him what was said. So we believe we have a clear violation here, and we have to—At this point, We've got to move for a mistrial.

THE COURT: Mr. McCleery?

MR. McCLEERY [Prosecutor]: Judge, this is the first time that I've heard this particular statement regarding going back to prison as has been said at this time. I would have, of course, instructed the witness not to—perhaps I would have—without taking it outside—taking it up outside the presence of the jury.

\* \* \* \* \* \*

THE COURT: The objection is overruled. I'll instruct you, Mr. Smith, not to make any reference whatsoever to any statements concerning a criminal history or any incarceration or any other crimes. Do you understand that?

THE WITNESS: Yes, sir.

\* \* \* \* \* \*

(Jury in.)

THE COURT: Ladies and gentlemen of the jury, in connection with the testimony of the witness concerning going back to prison, you are to put that out of your mind totally and absolutely. You're not to discuss it in your deliberations or consider it for any purpose. You are not to go into that for any reason or consider it for any reason. Do each of you understand that?

You may proceed.

■ It is an established principle that a defendant is not to be tried for collateral crimes or for generally being a criminal. *See Bordelon v. State,* 683 S.W.2d 9 (Tex.Crim.App.1985); *Williams v. State,* 662 S.W.2d 344 (Tex.Crim.App.1983). However, inadvertent references to prior incarceration can be cured of prejudicial effect. *See Gardner v. State,* 730 S.W.2d 675, 697 (Tex.Crim.App.1987), *cert. denied,* 484 U.S. 905, 108 S.Ct. 248, 98 L.Ed.2d 206 (1987); *Barney v. State,* 698 S.W.2d 114, 124–125 (Tex.Crim.App.1985); *Coe v. State,* 683 S.W.2d 431 (Tex.Crim.App.1984). In *Tennard v. State,* 802 S.W.2d 678, 685 (Tex.Crim.App.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 2914, 115 L.Ed.2d 1077 (1991), a witness inadvertently responded with an answer implying that the defendant had previously been incarcerated. Quoting from *Williams v. State,* 643 S.W.2d 136 (Tex.Crim.App.1982), the per curiam Court repeated that "[e]ven where such prejudicial information is inadvertently placed before a jury, the general rule is still that an instruction by the trial judge to the jury to disregard such answer will be sufficient to cure any unresponsive answer." *Id.* (citing *Williams, supra,* at 138). Therefore, the statement, virtually identical to the one made in the case-at-bar, was held cured when "the trial judge promptly instructed the jury to disregard the witness['s] answer." *Id.* at 685.

Likewise, the trial judge's prompt and thorough instruction cured any error presented in this case, and appellant's sixth point of error is overruled.

## VII.

■ In his seventh point of error, appellant maintains that it was error for the trial judge to allow State's witness Pat Hewlin, a chemist for the Texas Department of Public Safety, to testify in her expert capacity regarding the results of laboratory analyses performed on evidence which had been removed from the crime scene. In particular, appellant contends that the State failed to timely provide Hewlin's name on a witness list (as required by his granted pre-trial motion).

When reviewing a claim such as this, a number of factors surrounding the trial court's decision (and, hence, whether it was an abuse of discretion) must be considered. "Among the factors which will be considered by this Court in determining ... abuse of discretion is a showing of bad faith on the part of the prosecutor in failing to disclose ahead of time the name of the witness." *Hightower v. State,* 629 S.W.2d 920, 925 (Tex.Crim.App. [Panel Op.] 1981). "Another such factor is whether the defendant can reasonably anticipate

that the witness would testify although his or her name was not included within the witness list." [20]  *Id.*

In *Richardson*, fn. 20 *supra*, a clinical psychologist, unfamiliar with the defendant, was called by the State for the purpose of testifying on propounded hypotheticals.  744 S.W.2d at 77.  This Court applied the above discussed standard and found that the State had not acted in bad faith because it notified the defendant's counsel as soon as it contacted the witness.  *Id.* Moreover, the witness's testimony was not shown to be biased for one side or the other, and "the trial court did all it could to insure appellant was not unfairly harmed by [the witness's] testimony...."  *Id.* This included "offering to consider a postponement so that appellant could prepare for the testimony, an offer upon which the appellant failed to act."  *Id.*  Thus, the trial court was not found to have abused its discretion.  *Id.* at 78.

In the record of the proceedings below, it is apparent that the State filed several witness lists and that Hewlin's name did not appear on them; thus, appellant's contention merits review.  However, the record further shows that notice of Hewlin's name was file marked five days prior to the start of the State's direct evidence, a date eight days before the witness was actually called.[21]  Because there is no indication that the State was attempting to deceive the defense, bad faith has not been shown. Furthermore, other portions of the record indicate that appellant's counsel had, approximately one month prior to trial, visited the lab where Hewlin, under the direction of Ron Urbanovsky, was employed. As a consequence of this visit, as well as the later trial testimony of Urbanovsky (indicating that Hewlin had assisted him in the analysis of the various lab samples), it is reasonable to conclude that appellant's counsel could have anticipated that Hewlin would be called upon by the State to testify.  Nonetheless, once it became clear that the State was preparing to call the witness, the trial judge still offered to recess the trial in order to allow defense counsel time to interview the prospective witness.  This offer was not accepted.

Given the above, we find that allowing the witness, Hewlin, to testify was not an abuse of the trial court's discretion.  Appellant's seventh point of error is overruled.

## VIII.

▇  Appellant's eighth and final point of error challenges, as an improper *sua sponte* action, the trial court's excusal of Venireperson Buentello.  The record shows that, upon questioning by the State, it became apparent that the potential juror had a hearing defect.  *Voir dire* examination produced the following exchange:

Q  [By Ms. Garcia, prosecutor] I understand that you have a—somewhat of a hearing difficulty?

A  [Venireperson Buentello] Well, now, I can hear if you talk loud enough, my left ear.

\*      \*      \*      \*      \*      \*

Q  All right.  What is the nature of your hearing problem?

A  Well, many years back I was robbed, shot in the ear—in the head right here. And the doctor said it busted my ear drum or something up behind my ear.

Q  Can you hear from that ear at all?

A  Well, I can't hear the watches or anything, and sometimes I have difficulty.  You know at certain distance [sic] I can't understand the words, so I have to turn my right ear.

\*      \*      \*      \*      \*      \*

**20.**  This standard of review has been applied by us on many occasions.  *E.g., Stoker v. State,* 788 S.W.2d 1 (Tex.Crim.App.1989), *cert. denied,* 498 U.S. 951, 111 S.Ct. 371, 112 L.Ed.2d 333 (1990); *Richardson v. State,* 744 S.W.2d 65 (Tex.Crim. App.1987), *vacated on other grounds,* 492 U.S. 914, 109 S.Ct. 3235, 106 L.Ed.2d 583 (1989); *Bridge v. State,* 726 S.W.2d 558, 566 (Tex.Crim. App.1986); *Pinkerton v. State,* 660 S.W.2d 58 (Tex.Crim.App.1983).

**21.**  Furthermore, appellant's counsel stated that he was aware, on the day preceding the commencement of the State's case-in-chief, that the witness would be called.

Q  Mr. Buentello, do you think that you might miss some of the testimony, or do you—

A  Well, a few years back I serve [sic] on a civil jury, and I asked, you know, some of the jurors what they had said. And they told me what he had said, and that's how I got on that jury.

Q  So when you were on the jury, did you actually have trouble hearing some of the testimony in the trial?

A  Yeah, I find [sic] out afterwards. Because I didn't tell them right then, but afterwards I find [sic] out because I asked some of the jurors what they said and, you know, wrote down [sic] on a piece of paper.

Q  Okay.  All right.

MS. GARCIA: Well, Your Honor, we're going to ask—or we're going to challenge or ask that he been [sic] excused due to the hearing difficulty he's expressed that he's had—been a juror before, and it's [sic] presented a problem.

The defense was then allowed to question Buentello, and the venireperson did state that he would immediately inform the court if he ever had difficulty hearing a question. The trial court stated that he was "really concerned because [they had] a man's life in jeopardy ..." and he would "sure hate for him to miss something and not ... let the Court know...." Ultimately, the judge granted the challenge for cause; to this the defense counsel objected claiming that Buentello seemed, to them, acceptable.[22]

In a challenge of this nature, the relevant portion of the Code of Criminal Procedure is Article 35.16.  As Section (a) of that

article provides, a challenge may be made by the State or defense when a juror:

> 5. ... has such *defect in the organs of feeling or hearing,* or such bodily or mental defect or disease as to render him unfit for jury service,....

TEX. CODE CRIM.PROC.ANN art. 35.16(a)(5) (Vernon supp.1986) (emphasis added).  The trial court is charged with determining the qualifications of a prospective juror, and we are understandably hesitant, viewing only the record from below, to interpose our judgment on appeal. *See generally, Marras v. State,* 741 S.W.2d 395 (Tex.Crim. App.1987); *Woolls v. State,* 665 S.W.2d 455 (Tex.Crim.App.1983), *cert. denied,* 468 U.S. 1220, 104 S.Ct. 3592, 82 L.Ed.2d 889 (1984).

On the basis of the testimony adduced during *voir dire,* it is evident that the trial judge excused Venireperson Buentello pursuant to the State's challenge for cause. As such, his excusal was neither sua sponte, nor erroneous. Appellant's eighth point of error is overruled. Having found appellant's points of error to be meritless, we affirm the trial court's judgment.

CLINTON, J., dissents.

BAIRD, J., concurs in the result only as to point of error number I and joins the remainder of the opinion.

OVERSTREET, J., concurs in the result.

MALONEY, J., dissents to the disposition of point of error number I.

---

**22.** It should be noted that, following objection, the defense was allowed to question the venireperson and to develop a bill of exceptions. Following this questioning, a colloquy between the trial judge and Venireperson Buentello occurred, *viz:*

> THE COURT: Mr. Buentello, let me ask you this: Did I understand you correctly to inform the Court that you had previously sat in a civil jury and you could not hear and you had to ask other jurors what was being said?
>
> THE VENIREPERSON: Once we were in the room afterwards, yes, sir.
>
> THE COURT: That was even in the room afterwards.

> THE VENIREPERSON: Yes, sir. I didn't hear the Judge ask them whether anybody was having trouble with their hearing, but I was then because, like I said, they open [sic] my skull and—The bullet went right through here, and they open the skull to get the bullet. And they told me my hearing would be affected, and I guess it did. I know, because I couldn't hear nothing. And I guess as I get older, well, it's getting worse.

It seems apparent that, in light of such testimony, Buentello suffered from acute hearing loss. Thus, contrary to appellant's assertion, Buentello was not an acceptable juror.