

NUMBER 13-19-00015-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

GERARDO GONZALEZ SUSTAITA,                                    Appellant,

v.

THE STATE OF TEXAS,                                              Appellee.

### On appeal from the 389th District Court
### of Hidalgo County, Texas.

# MEMORANDUM OPINION

### Before Chief Justice Contreras and Justices Longoria and Hinojosa
### Memorandum Opinion by Chief Justice Contreras

Appellant Gerardo Gonzalez Sustaita was convicted on three counts of indecency with a child by exposure, each a third degree felony. *See* TEX. PENAL CODE ANN. § 21.11(a)(2). He was sentenced to prison terms of five, seven, and five years for the respective offenses, with the sentences ordered to run concurrently. On appeal, he complains that the trial court erred by: (1) allowing the State "to use the one witness rule

on reasonable doubt in voir dire"; (2) admitting testimony from a witness not disclosed on the witness list; (3) admitting testimony regarding an incriminating statement made by appellant; (4) excluding testimony of "animosity" between two witnesses; and (5) "repeatedly" admitting testimony about the complainant's credibility or truthfulness. We affirm.

## I. BACKGROUND

Appellant was charged with four counts of indecency with a child by exposure (Counts I, II, IV, and V) and one count of attempted aggravated sexual assault of a child (Count III). *See id.* §§ 15.01, 21.11(a)(2), 22.021(a)(2)(B).

At trial in October 2018, K.R. testified that she and her mother used to live in an apartment in McAllen with her maternal grandmother and appellant, her uncle. K.R. recalled the following incident which took place about one year before trial, when she was ten years old:

> Well, when [appellant] came from the apartment—so he came—well, like I thought he was drunk and—but he came with some—well, he came because he was at his friend's house. So he came and he went to his bedroom and my mom was making food because it was the morning. And he came out and he showed me his middle part and then he, like, bent down to, like, lick it and then he and my mom came and she came—she came out and she saw—and she saw [appellant] showing me his middle part.
>
> And my mom, she started yelling at [appellant] that why did he do that and then [appellant] said he was just going to go feed the dog because he had a dog. And then my mom just—my grandmother came from Reynosa and then my mom said the thing that [appellant] did to me.

Using a diagram of a male body, K.R. clarified that, by "middle part," she meant appellant's penis. According to K.R., later that day, appellant "showed [her] two pictures of a female and a male."

Sometime later the same year, K.R. and her family, including appellant, moved to

2

a house in Pharr. K.R. testified that the following incident occurred there:

> Well, I was in my uncle's room and we were playing a video game and then he tried to kiss me. And then after that, he like, touched my leg and then he like—oh, and then he—I tried to like—I started screaming and then my mom came and because my mom didn't—my mom, I told her—because I told my mom that I was going to go play video games with my uncle and she said, Okay, but I want the door open. And I said, Okay.

> But then my uncle closed it and then that's when he tried to kiss me and he touched my leg and then he grabbed me. And then my mom—I started yelling and then my mom came and she banged on the door. And then my uncle—I, like, my uncle had me like that and I pushed him and then I—the door was, like, locked and my uncle, like, grabbed me and then I pushed him and then I opened the door for my mom so she could come in.

K.R. clarified that appellant pushed her onto the bed and got on top of her, but she was able to push him and get out from under him. Another time, K.R. recalled, "[m]y grandma was making soup and then my uncle had a shirt[1] that had a hole and he showed me his middle part again. . . . He just took it out and he licked it again. . . ." Appellant was "staring" at K.R. as he did this. All of this made K.R. sad and uncomfortable. Eventually, she told her dance teacher, who reported the incidents to Child Protective Services (CPS).

On re-direct examination, K.R. recalled another incident in the McAllen apartment. She explained that, as she was bending down to get "some tea" from the refrigerator, she "felt [appellant] touch her bottom" with his hand, and appellant then pulled down his shorts and "showed [her] his middle part."

K.R. was interviewed at the Children's Advocacy Center and underwent counseling with her mother. She stated she used to have a good relationship with her grandmother, but they do not talk anymore. Her older sister also does not talk to her. On cross-examination, K.R. could not recall telling her interviewer that she "heard [her] uncle doing

---

[1] As in original reporter's record. Subsequently, K.R. agreed that it was appellant's "shorts" which had a hole.

it like a dog" or "mak[ing] the sound of a dog in an agitated way, breathing heavily." She also did not recall telling the interviewer that appellant showed her a video of "a female without clothes having sex."

L.S., K.R.'s mother and appellant's sister, testified that she was in the kitchen of the apartment and K.R. was watching television in the living room, when she noticed K.R. had a "face with fear" and was covering her eyes with a bed sheet. L.S. saw what she initially believed was appellant "pulling the elastic of his briefs." According to L.S., when appellant saw her, "he ran." She believed appellant had been drinking. L.S. asked K.R. what happened, and K.R. told her. L.S. then told her mother but did not call the police. She did not confront appellant out of "[f]ear that he would do something to me because he becomes aggressive." She did not leave the house with K.R. because she "didn't have anyone to go with." But she stated that, from that point on, she kept K.R. with her "all the time, not trusting my mother, not trusting my brother." She acknowledged that K.R. was only out of her sight for "a second," and that was when the incident in the Pharr house occurred. On cross-examination, when asked why she did not call the police after the first incident, L.S. replied: "Because I was stupid for listening to my mother." She did not take K.R. to a shelter because she was told that "they would take away my daughter" if she did.

Jennifer Zaccarias, a CPS investigator, testified that she visited the Pharr house after being assigned to the case, and she became concerned because appellant was still living there and had access to K.R. She advised L.S. that she needed to leave the home with K.R. Zaccarias said that L.S. seemed to be aware of the allegations, and that it is a crime not to report child abuse. Later that day, L.S. took K.R. to live with a friend.

4

Zaccarias also talked to appellant that day. Appellant was upset and confrontational. According to Zaccarias, "[appellant's] words were that he showed [K.R.] his dick. . . . He told me he didn't care that he was being investigated. . . . He stated he was drunk at the time and that his sister was calling him gay."

A.S., K.R.'s maternal grandmother, testified through a translator that she never saw appellant act around K.R. in a way that concerned or scared her. She said she never talked to her daughter L.S. about appellant exposing himself to K.R. She denied telling L.S. not to call the police. A.S. recalled that she told police that appellant "lowered his pants because he was angry with [L.S.]," but she could not recall whether she also told police that appellant exposed himself to K.R.

Rosita Resmondo, a forensic interviewer with the Children's Advocacy Center, testified that she interviewed K.R., that K.R. knew the difference between the truth and a lie, and that K.R. promised to tell the truth. Resmondo stated that K.R. brought up "the allegations" on her own and that K.R. told her who abused her. She did not notice "any signs of coaching or manipulation or implanted thoughts that didn't appear to be hers."

Appellant was convicted on Counts I, II, and IV,[2] and this appeal followed.

## II. DISCUSSION

### A. Voir Dire

By his first issue, appellant complains that, during voir dire, the prosecutor "was allowed to instruct the jury panel on the doctrine of the 'one witness rule' being sufficient to establish reasonable doubt." Appellant argues that the prosecutor improperly "implied that it was a necessity in certain cases" and challenged each veniremember "who did not

---

[2] Appellant was acquitted on Count III, and Count V was dismissed.

accept or questioned his interpretation of the law."

Appellant's trial counsel did not object to the prosecutor's statements. Therefore, the issue has not been preserved for our review, and we overrule it for that reason. *See* TEX. R. APP. P. 33.1; *Ross v. State*, 154 S.W.3d 804, 807 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) ("To preserve error regarding improper voir dire questions, a party must make a timely, specific objection at the earliest possible opportunity.").[3]

## B. Evidentiary Rulings

Appellant's remaining issues concern the trial court's admission and exclusion of certain evidence. We review the trial court's evidentiary rulings for abuse of discretion. *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016). A trial court abuses its discretion when its decision falls outside the zone of reasonable disagreement. *Id.* If the evidentiary ruling is correct under any applicable theory of law, it will not be disturbed, even if the trial court gave a wrong or insufficient reason for the ruling. *Id.*

### 1. Undisclosed Witness

By his second issue, appellant contends that the trial court erred by allowing the testimony of Andrea Chavez, K.R.'s dance teacher, on the basis that her name was not included on the State's witness list. At trial, the prosecutor admitted that he "missed her name" in preparing a supplemental witness list, but represented that defense counsel "was aware of her existence and that she was a potential witness in this case from the very beginning."[4] The prosecutor also stated that Chavez's name had been redacted from

---

[3] Appellant does not argue that there was a "fundamental error affecting a substantial right." *See* TEX. R. EVID. 103(3) ("In criminal cases, a court may take notice of a fundamental error affecting a substantial right, even if the claim of error was not properly preserved.").

[4] Defense counsel conceded that the prosecutor "might have" made him aware of Chavez's name in previous conversations.

6

CPS records which had been furnished to the defense because Chavez was the person that initially reported the alleged abuse. After the prosecutor explained that he would not be asking Chavez about what K.R. told her, defense counsel acknowledged that, though Chavez's name was redacted from the CPS records, her identity as a "folklorico teacher" and reporter of abuse was included. The trial court stated: "Okay. Then we're good to go. You knew about the folklorico teacher. If that's all the questions you're going to ask, then we're good. Otherwise, don't go any further." Chavez then testified that K.R. was one of her students; that K.R. approached her last year and spoke to her; that, after the conversation with K.R., Chavez contacted the school counselor; and that the school counselor then contacted CPS.

Appellant argues that the State's failure to disclose Chavez's name violated article 39.14(b) of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 39.14(b) (requiring a witness list to be provided not later than thirty days prior to trial); *see also Nobles v. State*, 843 S.W.2d 503, 514–15 (Tex. Crim. App. 1992) (stating that, in evaluating whether a trial court abused its discretion in permitting testimony of an undisclosed witness, courts consider whether there was "a showing of bad faith on the part of the prosecutor" and whether the defendant could "reasonably anticipate that the witness would testify"). He argues the State "purposely hid the identity of the witness" and that his trial counsel "knew nothing about this witness until she was called."

If a witness's name is not furnished to a defendant before trial despite a court order, any error in allowing that witness to testify over a claim of surprise is "made harmless" by the defendant's failure to object and move for a continuance. *Barnes v. State*, 876 S.W.2d 316, 328 (Tex. Crim. App. 1994) (finding, where appellant objected to testimony of

7

undisclosed witness "but failed to move for a continuance in order to interview the witnesses or determine the matters about which they were to testify," that appellant "cannot now be heard to complain"). Here, appellant objected to Chavez's testimony but did not move for a continuance. Moreover, appellant does not explain whether or how the admission of Chavez's testimony affected his substantial rights. *See* TEX. R. APP. P. 44.2 (setting forth standard for reversible error in criminal cases). Therefore, even assuming that the trial court implicitly ruled on appellant's objection and that such ruling was erroneous, appellant has not shown the error would be reversible. *See id.*; *Barnes*, 876 S.W.2d at 328. We overrule his second issue.

### 2. Appellant's Statement

Appellant next contends, by his third issue, that the trial court erred by admitting Zaccarias's testimony regarding statements appellant made to her because (1) *Miranda* warnings were not given, and (2) the statement "was not corroborated." At trial, defense counsel objected to this testimony on hearsay grounds only. The prosecutor responded by arguing the testimony was a statement against interest and an admission by a party-opponent. *See* TEX. R. EVID. 801(e)(2), 803(24). The trial court overruled the objection.

To preserve error for appeal, the point of error on appeal must comport with the objection made at trial. *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012). Because appellant did not raise any issue related to *Miranda* warnings or lack of corroboration at trial, the issue is not preserved for our review. *See* TEX. R. APP. P. 33.1(a)(1)(A); *Clark*, 365 S.W.3d at 339 ("[I]f a party fails to properly object to constitutional errors at trial, these errors can be forfeited."). Appellant's third issue is overruled.

8

### 3.     Evidence of "Animosity" Between Witnesses

By his fourth issue, appellant argues that the trial court erred, violating his Sixth Amendment right to confront witnesses, by "fail[ing] to allow the defense to cross-examine [A.S.] about the animosity [L.S.] showed towards her." He cites only *Davis v. Alaska*, in which the United States Supreme Court held that the petitioner's right to confront witnesses was violated when the trial court refused to allow cross-examination regarding a witness "being on probation under a juvenile court adjudication." 415 U.S. 308, 313, 318 (1974).

During cross-examination, A.S. testified that, when she purchased the Pharr house, she put it in appellant's name. The following colloquy then occurred:

| | |
|---|---|
| Q. [Defense counsel] | And what about [L.S.]? Why didn't you put it under her name? |
| [Prosecutor]: | Objection, Your Honor, relevance. |
| [Defense counsel]: | Judge, this ties into— |
| [Prosecutor]: | Your Honor, I'm going to object to a speaking objection. |
| THE COURT: | Go ahead. |
| [Defense counsel]: | Your Honor, this ties into [L.S.]'s demeanor and her behavior as to why she would possibly go forward with these allegations. |
| THE COURT: | Under what rule? |
| [Defense counsel]: | Your Honor, I don't have that handy, Judge. |
| THE COURT: | I suggest you find it. |
| [Defense counsel]: | What's the State's objection? |
| [Prosecutor]: | Relevance. |
| THE COURT: | Relevance. |

[Defense counsel]: Your Honor, we'll rephrase the question.

THE COURT: All right.

Q. [Defense counsel] So you placed it under [appellant]'s name. Correct?

A. Yes, sir.

Q. And you-all moved in sometime in April, May of that year?

A. In April.

Q. And did you have a good relationship with [L.S.]?

A. No, sir.

Q. At what point in time was your relationship good with her?

A. All the time back, '17 and back. When we moved into that house—

Q. And did the relationship—

A. —started—

Q. —change after you purchased the house?

A. The relationship was aggravated a lot.

Q. Now, was this between you and [L.S.]?

A. Yes, sir.

Q. And did you notice a change in relationship between [appellant] and [L.S.]?

A. They would fight a lot.

Q. Was this all the time or before or after the purchase?

A. Before they would fight, but it became more serious, more—it got worse after—at this address.

Q. Can you give us an example of how it got worse?

A. She would tell me things, she would insult him.

10

| | |
|---|---|
| Q. | Let's focus on you. What sort of disrespect did you feel? |
| [Prosecutor]: | I'm going to object to relevance, Your Honor. |
| THE COURT: | Relevance? |
| [Defense counsel]: | I'll rephrase, Judge. |
| Q. [Defense counsel] | Tell us some of the incidents that occurred, that happened. |
| [Prosecutor]: | I'm going to object to improper impeachment evidence, Your Honor. The question's— |
| THE COURT: | I know what the question is, I'm trying to figure out your objection. As far as your objection, I'm not quite sure what you mean. |
| [Prosecutor]: | He's not asking about specific instances— |
| THE COURT: | He's not trying to impeach her, so that's my point. So I'm not quite sure what you mean. |
| [Prosecutor]: | Then I'd also object to relevance, Your Honor. |
| THE COURT: | All right. Relevance? |
| Q. [Defense counsel] | Did you ever go and work up north as migrants? |
| A. | Yes, sir. |
| Q. | And who was this? Who was it that went up north to work as migrants? |
| A. | [Appellant] and I. |

The prosecutor objected at least three times on relevance grounds, and each time, defense counsel rephrased the question before the trial court ruled on the objection. As a prerequisite to presenting a complaint for appellate review, the record must show that an objection was made and that the trial court either: (A) ruled on it, either expressly or implicitly; or (B) refused to rule it, and the complaining party objected to the refusal. TEX. R. APP. P. 33.1(a)(2). The trial court did not rule on the State's objections, expressly or

11

implicitly, and no party objected to its failure to rule. Even assuming the trial court's comments could somehow be construed as an implicit granting of the State's objections, appellant never made an offer of proof that would allow us to determine if that ruling was erroneous, nor was the content of A.S.'s purportedly disallowed testimony apparent from the context. *See* TEX. R. EVID. 103(a)(2) (stating that a party may complain of the exclusion of evidence only if it "informs the court of its substance by an offer of proof, unless the substance was apparent from the context"). Therefore, appellant's fourth issue has not been preserved for our review, and we overrule it.

### 4.     Testimony About Complainant's Credibility

Finally, appellant argues by his fifth issue that the trial court erred in allowing Resmondo "to give his [sic] opinion as to the truthfulness of [K.R.]" *See Lopez v. State*, 343 S.W.3d 137, 140–41 (Tex. Crim. App. 2011) ("Direct opinion testimony about the truthfulness of another witness, without prior impeachment, is inadmissible as it does more than 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" (Footnotes and quotation omitted)); *Schutz v. State*, 957 S.W.2d 52, 59 (Tex. Crim. App. 1997) ("Expert testimony does not assist the jury if it constitutes a direct opinion on the truthfulness of a child complainant's allegations."). Appellant claims Resmondo "became an advocate for the child" and "indicated [K.R.] was telling the truth."

Once again, appellant failed to preserve this issue. Defense counsel did not object to Resmondo's testimony on grounds that it constituted an impermissible opinion on K.R.'s truthfulness.[5] *See* TEX. R. APP. P. 33.1(a)(1)(A); *Clark*, 365 S.W.3d at 339. Even if

---

[5] Defense counsel objected on "speculation" grounds to the following questions posed by the prosecutor: (1) "Throughout the interview, how did [K.R.] act? Was she open and communicative to you?"; (2) "[I]n your expert opinion, when a child victim that you've interviewed is going to have to testify in trial, does the stress of that knowledge, knowing that they're going to have to do that, can that act as a catalyst

he did, the trial court would not have erred by denying such an objection. Although Resmondo stated that K.R. knew truth from lies and that the child was forthcoming with information during her Children's Advocacy Center interview, Resmondo did not "directly" opine as to K.R.'s truthfulness. *See Lopez*, 343 S.W.3d at 140–41; *Schutz*, 957 S.W.2d at 59. We overrule appellant's fifth issue.

## III. CONCLUSION

The trial court's judgment is affirmed.

DORI CONTRERAS
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
9th day of April, 2020.

---

or a trigger to bring forth other memories of other instances of trauma?"; and (3) "If a child is aware that they are going to be having to testify in court as to the allegations of child sex abuse, is it your expert opinion that that stress can act as a catalyst to bring forth other allegations, memories of child sex trauma?" The prosecutor withdrew the first two questions and the trial court implicitly denied appellant's objection to the third question. None of these questions sought to elicit Resmondo's direct opinion as to K.R.'s truthfulness.