Stiles-MT v. State 
















IN THE
TENTH COURT OF APPEALS
 

No. 10-94-073-CR

     MICHAEL THOMAS STILES,
                                                                                              Appellant
     v.

     THE STATE OF TEXAS,
                                                                                              Appellee
 

From the 363rd District Court
Dallas County, Texas
Trial Court # F94-00102-IW
                                                                                                    

O P I N I O N
                                                                                                    

      Appellant Michael Thomas Stiles was convicted by a jury on one count of first degree injury
to a child and was sentenced by the same jury to fifty years of confinement in the Institutional
Division of the Texas Department of Criminal Justice. Tex. Penal Code Ann. § 22.04 (Vernon
1994). Stiles raises fifteen points on appeal. In point one he contends the State violated Batson
v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712 (1986), by striking three members of the venire panel
solely because of their race. In points two through five he argues the trial court erred in allowing
his confession into evidence because it was obtained without Stiles having been read the statutory
Miranda warnings. See Tex. Code Crim. Proc. Ann. art. 38.22, § 2 (Vernon 1979); Miranda
v. Arizona, 384 U.S. 436, 86 S.Ct. 1602 (1966). In points six through eleven Stiles contends the
same confession was inadmissible because law enforcement officials, before taking the confession,
refused to honor his request for the assistance of counsel during the interrogation. In point twelve
Stiles maintains that the trial court erred in failing to file findings of fact and conclusions of law
on the voluntariness of his confession. In points thirteen and fourteen Stiles argues the trial court
erred in allowing evidence of extraneous offenses before the jury. And in his final point Stiles
complains about improper jury argument. We affirm.
      On November 29, 1993, the date of the offense, Stiles was living in a mobile home in Irving
with his girlfriend, Paula Darlene Genzel, their two children, Michael Antoni Thomas Stiles
(referred to by his parents as Antoni) and Andromeda Marie Stiles (nicknamed Andy), and
Genzel's third child, Destiny Lynn Jackson, who was fathered by another man. Andy was three
months old, Antoni was two years old, and Destiny was seven.
      On the morning of November 29, Andy awoke around 7:30. Sometime between 8:00 and
8:30, Genzel, who had been feeling ill, asked Stiles if he would feed Andy, and he agreed. Stiles
went into the kitchen to warm her bottle and asked Genzel to retrieve a clean diaper so that he
could change her. Stiles then took Andy into the master bedroom and closed the door.
      According to Stiles, he changed her diaper and then, after sitting down on the waterbed, he
sat her in his lap and fed her baby formula from the bottle. After Andy drank a few ounces of
formula, Stiles took the bottle away from her because he was afraid she would drink too much. 
Andy then began to fuss. Stiles then played with Andy for awhile until Antoni came into the
bedroom. Stiles quickly ordered him to leave the bedroom. After Antoni left, Stiles fed Andy the
rest of the bottle. Stiles then burped Andy, and she vomited on his shirt. Stiles became angry and
threw her onto the waterbed. Andy's head struck a rail that ran alongside the bed. Andy
screamed and began to choke. Stiles called for Genzel. Aside from the brief moment when
Antoni ran into the bedroom, Stiles was alone in the bedroom with Andy with the door closed
during the time of the events immediately preceding her injury. Stiles's confession constituted the
only direct evidence of what occurred between him and Andy while in the bedroom.
      When Genzel arrived in the room, Andy was blue. Genzel felt for a pulse and breathed into
Andy's mouth. Andy vomited into Genzel's mouth. Genzel then tried breathing into Andy's nose. 
Genzel was unable to locate a pulse, but Andy occasionally convulsed and vomited during these
convulsions.
      At this time, Genzel asked Stiles to call for an ambulance. At first he refused, and Genzel
tried to walk past him to leave the bedroom. Stiles, however, blocked her way, and Genzel fell. 
Stiles then changed his mind and telephoned for emergency assistance. Emergency-assistance
personnel then gave instructions over the telephone on how to care for Andy, and Stiles relayed
the instructions to Genzel, who followed them. Paramedics from the Irving Fire Department
arrived soon thereafter and, upon examining Andy, were able to locate a pulse. Andy was first
transported to Irving Hospital and then to Children's Hospital in Dallas. Andy was placed on life
support at Children's Hospital and was ultimately declared dead on November 30, 1993, when her
life support apparatus was removed. Dr. Jeffery Barnard, Chief Medical Examiner for Dallas
County, determined that the cause of Andy's death was blunt force trauma to her head.
      In his first point of error Stiles contends the trial court erred in overruling his motion to strike
the jury panel after the State had improperly used three peremptory challenges allegedly in
violation of Batson v. Kentucky, 476 U.S. at 86, 106 S.Ct. at 1717. Stiles, who is white,
complains that the State impermissibly struck three black veniremen, numbers 18, 23, and 25,
solely because of their race. See Powers v. Ohio, 499 U.S. 400, 409-10, 111 S.Ct. 1364, 1370
(1991) (the holding in Batson is applicable to a white defendant who strikes black veniremen on
the basis of their race).
      When a Batson complaint is made to the trial court, the defendant has the initial burden of
making a prima facie case of racial discrimination, thereby raising a presumption of a Batson
violation. Harris v. State, 827 S.W.2d 949, 955 (Tex. Crim. App. 1992), cert. denied, — U.S.
—, 113 S.Ct. 381 (1992). If the defendant makes a prima facie showing of discrimination, a
"Batson hearing" is then held and the burden shifts to the State to present a race-neutral reason or
reasons for striking the venireman. Cantu v. State, 842 S.W.2d 667, 688 n.15 (Tex. Crim. App.
1992), cert. denied, — U.S. —, 113 S.Ct. 3046 (1993). Upon such presentation, the burden shifts
back to the defendant to rebut the State's race-neutral reasons by refuting or impeaching the race-neutral reasons or showing that they are merely a pretext for discrimination. Id. It is at this third
stage that the court determines whether the venireman, or veniremen, at issue was actually struck
for a race-neutral reason. Purkett v. Elem, — U.S. —, —, 115 S.Ct. 1769, 1770 (1995); Joseph
v. State, 916 S.W.2d 657, 659-60 (Tex. App.—Houston[14th Dist.] 1996, no pet.).
      During voir dire, Stiles made a prima facie showing that the State struck veniremen 18, 23,
and 25 because they were black. A Batson hearing followed, and the State responded that it did
not strike these veniremen because of their race. It asserted the fact that it had allowed three other
black veniremen to sit on the jury demonstrated the State's lack of bias against black veniremen. 
The State also asserted that it struck veniremen 18, 23, and 25 because they all had relatives who
had been in trouble with the law. The State asserted that: venireman 18's sister and brother-in-law
had been tried for sexual abuse and found not guilty; that venireman 23 had a brother-in-law
currently serving a sentence in the penitentiary for murder;


 and venireman 25's uncle was
currently serving a jail sentence for check fraud. The State then further defended its strikes of
veniremen 18, 23, and 25 by noting that it struck a white juror, venireman 3, whose son had been
in trouble with the law on three occasions and was incarcerated at least twice, once for robbery
and once for drug possession.



      Stiles responded by noting that the State did not strike venireman 33, a white woman, whose
nephew had been convicted of breaking and entering a habitation in San Antonio. Stiles also
commented that since it was venireman 23's brother-in-law, not brother, who had been convicted
of murder the connection between the two was not strong and would not have much effect on the
venireman's objectivity. Stiles argued further that it is inconsistent for the State to allow
venireman 33, a white woman, whose son had been convicted of burglary of a habitation,


 to sit
on the jury while the State struck venireman 25 whose uncle had been convicted of the less serious
offense of check fraud. With regard to venireman 18, Stiles argued that she had stated she could
be a fair and impartial juror; therefore, he contended that there was no reason to strike her.
      The State responded that, concerning venireman 23, there is no meaningful difference between
one's concern for his brother and one's concern for his brother-in-law. The State also noted that
it was venireman 33's nephew, not son, who had been convicted of burglary in San Antonio. 
Moreover, the nephew was not serving any time in the penitentiary, but had been given a probated
sentence. In addition, the State defended its failure to strike venireman 33 on the ground that her
husband is the Fire Marshall in the City of Lancaster, which indicated to the State that she would
be a strong State-oriented juror, especially due to the fact that the State intended to call medical
personnel from the Irving Fire Department to testify.
      We review the evidence adduced at Batson hearings in the light most favorable to the trial
court's ruling. Kemp v. State, 846 S.W.2d 289, 304 (Tex. Crim. App. 1992), cert. denied, —
U.S. —, 113 S.Ct. 2361 (1993). A trial judge's finding that the State exercised its strikes in a
race-neutral manner will not be overturned unless such ruling is clearly erroneous. Id. The trial
court's ruling will be found to be clearly erroneous only if no plausible basis exists to support it. 
See Whitsey v. State, 796 S.W.2d 707, 721-22 (Tex. Crim. App. 1990) (on rehearing) (quoting
Anderson v. City of Bessemer City, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 1511 (1985)).
      It is well-established that the striking of a venireman because a relative had been formally
accused of criminal wrongdoing will constitute a race-neutral reason for striking him. See Harris,
827 S.W.2d at 955; Garcia v. State, 833 S.W.2d 564, 567 (Tex. App.—Dallas 1992), aff'd, 868
S.W.2d 337 (Tex. Crim. App. 1993); Wilson v. State, 769 S.W.2d 682, 683 (Tex.
App.—Beaumont 1989, no pet.). The State's assertion that it did not strike venireman 33 because
her husband is a fire marshall and therefore would probably be a prosecution-oriented juror is
plausible. The fact that the State also struck venireman 3, a white juror whose son had been
convicted three times of criminal offenses, further supports the trial court's ruling. We note that
the State still struck venireman 3 even though he indicated that he thought his son was rightly
treated by the criminal justice system, that his son "got what he deserved," and that he would not
be affected as a juror by his son's experiences in the criminal justice system. Having carefully
examined the record of the Batson hearing and the voir dire, we conclude that the trial court's
finding of no purposeful discrimination is supported by the record and was not, therefore, clearly
erroneous. We overrule Stiles's first point of error.
      In his third through eleventh points of error, Stiles complains the trial court erred in
overruling his motion to suppress the two documents which comprise the confession he gave to
the Irving Police Department on November 30 and December 1, 1993. Specifically, in points two
and three he alleges law enforcement officials obtained his confession without reading him the
warnings required by Miranda. In points four and five he complains that law enforcement officials
also failed to read him his statutory warnings as required by Tex. Code Crim. Proc. Ann. art.
38.22, § 2. In points six and seven he complains the confession was illegally obtained in violation
of his fifth amendment right to counsel. U.S. Const. amends. V, XIV. In points eight and nine
he alleges the confession was obtained in violation of his right to counsel under article I, section
10, of the Texas Constitution. Tex. Const. art. I, § 10. And in points ten and eleven he asserts
the confession was obtained in violation of his statutory right to counsel under Tex. Code Crim.
Proc. Ann. art. 38.22, § 2.
      The record reveals that, on the date of the offense, Irving Police Officer John Cshingle was
patrolling the area where Genzel and Stiles lived when he noticed an ambulance and a fire truck
near their home. Officer Cshingle inquired from one of the firemen on the scene the reason for
their presence. The fireman responded that they were taking a three-month old baby to Irving
Hospital. Officer Cshingle then drove straight to the hospital where he met Stiles. He spoke with
Stiles about the cause of Andy's injuries, and Stiles explained that, after he had fed Andy earlier
that morning, she threw up and started choking on her own vomit. During their conversation,
Stiles also mentioned to Officer Cshingle that there were some warrants outstanding for his arrest
for some traffic violations. Officer Cshingle believed that Stiles did not seem saddened or upset
by the injuries Andy had sustained, which caused Officer Cshingle to be suspicious of him.
      Sometime after Officer Cshingle left the hospital, he heard from Investigator Fred Curtis of
the Irving Police Department that Stiles might be leaving for California. Therefore, at around
2:15 p.m. on the following day, Officer Cshingle drove to Genzel's and Stiles's home to arrest
him for the outstanding traffic warrants. Officer Cshingle took him into custody, read him his
statutory Miranda warnings, and put him in his patrol car.
      At about the time Officer Cshingle put Stiles in the patrol car, Investigator Curtis arrived at
the scene. Investigator Curtis, while Stiles was in the patrol car, informed him that he was being
taken to the Irving Police Department, that arrest warrants were currently outstanding for him for
some traffic violations, and that Investigator Curtis wanted to speak to Stiles about Andy. 
Investigator Curtis also read Stiles the statutory Miranda warnings.
      Once they arrived at the police station, Investigator Curtis began to interrogate Stiles in a
private room. After Investigator Curtis spoke only briefly to Stiles, Stiles stated that he did not
want to talk to him anymore, and the interview ended. Investigator Curtis then returned Stiles to
the jail area of the police station.
      About 30 to 45 minutes later Stiles notified one of his jailers, Officer Bryan Smith, that he
wished to speak to Investigator Curtis again. Investigator Curtis was informed of Stiles's request,
and he returned to the jail area to see Stiles. Investigator Curtis asked him if he wished to speak
to him, and Stiles answered, "Yes." Before the interrogation recommenced, Investigator Curtis
asked Stiles if he understood his Miranda warnings, and Stiles responded in the affirmative. 
Investigator Stiles did not, however, re-read the warnings for Stiles. Stiles then made a statement
that was recorded on a dictaphone. The statement was subsequently played from the dictaphone
and typed onto paper. After it was typed, the paper was then read back to Stiles, and it was shown
to him so that he could read it. In the statement Stiles stated, among other things, that while trying
to burp Andy, she vomited on his shirt and that that made him angry so he threw her down on the
bed. He asserted that he threw her down without thinking, that he never intended to hurt her, that
it was just a reaction, and that it was an accident that she hit her head. Stiles then signed the
statement.
      Sometime after Stiles gave his statement, Investigator Curtis spoke with Dr. Barnard, who had
performed the autopsy on Andy. Dr. Barnard told Investigator Curtis that more force than what
Stiles had claimed to have used would have been required to cause Andy's injuries. Investigator
Curtis, consequently, decided to speak to Stiles again. Upon seeing Stiles, Investigator Curtis
reminded him of the statutory Miranda warnings and informed Stiles about Dr. Barnard's opinion. 
Stiles decided then to make another statement, wherein he stated that, after Andy vomited on him,
he became angry and "slammed" her onto the waterbed with "about half the force" that he could
muster.


 Stiles also confessed to having lied in the previous day's statement. Stiles read the
statement and signed it.
      In a suppression hearing, the trial court is the sole trier of fact and judge of the credibility of
the witnesses and the weight to be given their testimony. Romero v. State, 800 S.W.2d 539, 543
(Tex. Crim. App. 1990); Roth v. State, 917 S.W.2d 292, 299 (Tex. App.—Austin 1995, no pet.). 
The trial court may accept or reject any or all of any witness's testimony. Alvarado, 853 S.W.2d
17, 23 (Tex. Crim. App. 1993); Allridge, 850 S.W.2d 471, 492 (Tex. Crim. App. 1991), cert.
denied, — U.S. —, 114 S.Ct. 101 (1993). The trial court resolves all conflicts in the testimony. 
Hawkins v. State, 853 S.W.2d 598, 600 (Tex. App.—Amarillo 1993, no pet.) An appellate court
must view the evidence in the light most favorable to the trial court's ruling at the suppression
hearing. Upton v. State, 853 S.W.2d 548, 553 (Tex. Crim. App. 1993); State v. Hamlin, 871
S.W.2d 790, 792 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd); Spillman v. State, 824
S.W.2d 806, 810 (Tex. App.—Austin 1992, pet. ref'd). If the trial court's findings are supported
by the record, the court on appeal will not disturb the findings absent an abuse of discretion. 
Cantu v. State, 817 S.W.2d 74, 77 (Tex. Crim. App. 1991). In the instant case, the trial court
denied Stiles's motion to suppress the two statements on the ground that they were given
voluntarily and that Stiles had freely and voluntarily waived his rights under Miranda.
      In his second and third points of error, Stiles asserts that the prophylactic warnings required
by Miranda were not read to Stiles either time he made a statement and, therefore, the statements
were inadmissible. He asserts that Investigator Curtis merely "reminded" Stiles of the Miranda
warnings and, because Miranda allegedly requires that the warnings be read each time
interrogation takes place, Investigator Curtis's reminder was insufficient. In points of error four
and five Stiles makes essentially the same argument under article 38.22, section 2, of the Code of
Criminal Procedure.
      The record is clear that Stiles was read the statutory Miranda warnings at least twice before
he gave either statement. Whether or not law enforcement officials subsequently read the
warnings to Stiles again each time he was interrogated is irrelevant. Allridge v. State, 762 S.W.2d
146, 157-58 (Tex. Crim. App. 1988), cert. denied, 489 U.S. 1040, 109 S.Ct. 1176 (1989). It is
true that Stiles invoked his right not to speak to any law enforcement officials before the
interrogation which led to the first and second statements began, but Stiles freely and voluntarily
relinquished that right when he told his jailer, Officer Smith, that he wanted to speak to
Investigator Curtis again. Stiles contends that there was no waiver because, when he requested
to speak to Investigator Curtis again, the only subject he wanted to discuss with Investigator Curtis
was the reason for Andy's death.


 Stiles's argument is meritless for two reasons.
      First, nowhere in the record is it stated that either Officer Smith or Investigator Curtis was
made aware of the limited nature of Stiles's waiver. The reason for the Miranda prophylactic
warnings is to "insure that the right against compulsory self-incrimination [is] protected." 
Michigan v. Tucker, 417 U.S. 433, 444, 94 S.Ct. 2357, 2364 (1974). As Stiles admits in his
brief, Investigator Curtis "scrupulously honored" Stiles's request to end the interview. See
Miranda, 384 U.S. at 479, 86 S.Ct. at 1630. According to Officer Smith and Investigator Curtis,
Stiles then wanted to speak to Investigator Curtis further. Subjectively, Stiles may have wanted
only to speak about the cause of Andy's death. But the test for whether Stiles properly waived his
right not to be interrogated any further is an objective one. See Davis v. United States, — U.S.
—, —, 114 S.Ct. 2350, 2355 (1994) (holding that the test for whether a criminal suspect has
invoked his fifth amendment right to counsel is an objective one). A reasonable person hearing
Stiles's request would have thought that he wished to allow Investigator Curtis to proceed with the
interrogation. Stiles's subjective intent simply does not factor into the equation.
      Second, we are aware of no authority allowing the criminal suspect to set the parameters of
the interrogation. The law is clear that Stiles had the right to terminate his interrogation at any
time. Tex. Code Crim. Proc. Ann. art. 38.22, § 2. The law is also clear that Stiles could
subsequently waive his invocation of that right. See Edwards v. Arizona, 451 U.S. 477, 484, 101
S.Ct. 1880, 1884-85 (1981); Hicks v. State, 860 S.W.2d 419, 429-30 (Tex. Crim. App. 1993),
cert. denied, — U.S. —, 114 S.Ct. 2725 (1994). The issue to be resolved when the suspect then
wishes only partially to waive his right to end the interrogation would be whether the suspect
actually completely waived his right. See Davis, — U.S. at —, 114 S.Ct. at 2355 (a statement is
either an assertion of the fifth amendment right to counsel or it is not). It would seem that if a
suspect, after invoking his right to end the interview, then notifies law enforcement officials that
he wishes to recommence the interrogation, questioning could then proceed, and if the suspect
should later find that he would prefer not to answer any more questions, then he could re-invoke
his right to terminate the interview. It would be futile for this court to require law enforcement
officials to recognize the extent to which the suspect has waived his right to halt any questioning. 
Well-meaning law enforcement officials could, without intent, run afoul of the proposed limitation
on the waiver and obtain inculpatory information that would later be held inadmissible in court
even though there was no undue compulsion used against the suspect and no violation of the
Miranda prophylactic rules. We will not create such an ill-advised requirement.
      In sum, Stiles was properly read the statutory Miranda warnings at the time of his arrest. He
was subsequently interrogated, and he invoked his right to terminate the interview. Approximately
30 to 45 minutes later, he freely and voluntarily waived that right by asking to speak to
Investigator Curtis again. Because Stiles had already been read the statutory Miranda warnings,
Investigator Curtis was not required to read the warnings to Stiles again before recommencing the
interrogation. Stiles's second and third points are overruled.
      In points six through eleven Stiles contends his rights to counsel under the fifth amendment
to the United States Constitution, under article I, section 10, of the Texas Constitution, and article
38.22, section 2, of the Code of Criminal Procedure were violated when Investigator Curtis
recommenced the interrogation after Stiles had allegedly stated to Investigator Curtis that he
wanted to talk to a lawyer. Investigator Curtis, however, denied that Stiles requested a lawyer. 
Investigator Curtis testified that Stiles only requested that the interview cease and that he honored
that request. In a suppression hearing, the trial court resolves all conflicts in the testimony and
may accept or reject any or all of any witness's testimony. Alvarado v. State, 853 S.W.2d at 23;
Allridge v. State, 850 S.W.2d at 492; Hawkins v. State, 853 S.W.2d 598, 600 (Tex.
App.—Amarillo 1993, no pet.). Here, the trial court implicitly rejected Stiles's testimony that he
requested an attorney and, instead, chose to believe Investigator Curtis. Therefore, we must
accept the trial court's conclusion that Stiles did not request an attorney. Because Stiles never
requested an attorney, he cannot complain that Investigator Curtis violated his rights in failing to
provide him one. Points six through eleven are overruled.
      In point of error twelve Stiles asserts the trial court erred in failing to make findings of fact
and conclusions of law on the voluntariness of his confession. See Tex. Code Crim. Proc. Ann.
art. 38.22, § 6 (Vernon 1979). On March 20, 1995, a supplemental transcript was filed in this
court containing the trial court's finding of facts and conclusions of law on the voluntariness of
Stiles's confession. Stiles's complaint in his twelfth point is moot; therefore, we overrule his point
of error.
      In his thirteenth point Stiles complains that the trial court erred in not granting his motion for
a mistrial after evidence of an extraneous offense was admitted to the jury. Stiles complains about
a portion of the first statement of his confession wherein he stated, in essence, that part of the
reason he threw Andy onto the bed was because he felt pressure from having been investigated by
Child Protective Services (CPS) for breaking one of Antoni's legs.



       At the hearing to determine the voluntariness of Stiles's confession, Stiles made no objection
that the complained-of statement constituted an inadmissible extraneous offense. After the
hearing, the State asked Investigator Curtis to read the first of Stiles's two statements. At that
time, Stiles renewed his objection that the confession was made involuntarily, but he made no
objection that the complained-of statement was an extraneous offense. The trial court overruled
Stiles's objection, and Investigator Curtis read the first statement.
      After the statement was read, and more testimony was taken from Investigator Curtis, the trial
court, sua sponte and outside the presence of the jury, expressed its concern to the parties that it
believed the complained-of statement constituted an extraneous offense. The State then informed
the trial court that it would not oppose an instruction to the jury to disregard the comment. Stiles
responded that an instruction to disregard would be insufficient to cure the alleged error and that
the trial court should order a new trial because of the alleged error. The trial court ruled that it
would issue an instruction to disregard but would not order a mistrial.
      To preserve a complaint for appellate review, the appellant must make an objection at the time
the error occurs. Tex. R. App. P. 52(a); Rhett v. State, 839 S.W.2d 93, 94 (Tex. Crim. App.
1992). This "contemporaneous objection" is necessary to provide the trial court with an
opportunity to prevent any error from occurring, or to remedy any error, if possible, at the earliest
possible moment. See id. Here, the alleged error about which Stiles complains occurred without
any contemporaneous objection. No discussion of the possible error was even undertaken by Stiles
until some time after it occurred and only after the trial court expressed its own reservations about
whether an error had possibly occurred. Because Stiles did not raise a contemporaneous objection,
he failed to preserve his complaint for our review.
      Assuming that the complaint was preserved, there was nevertheless no error in allowing the
complained-of statement into evidence. While evidence of extraneous offenses is generally not
admissible to show the bad character of the criminal defendant, it is admissible for other purposes,
such as proof of intent or absence of mistake or accident. Tex. R. Crim. Evid. 404(b); see Nobles
v. State, 843 S.W.2d 503, 514 (Tex. Crim. App. 1992); Albrecht v. State, 486 S.W.2d 97, 100-01
(Tex. Crim. App. 1972).
      The record is clear that Stiles admitted to throwing Andy onto the waterbed but that it was an
accident that she hit her head against the bedrail. He contended that he never intended to hurt
Andy and that he merely "tossed," Stiles's words to Investigator Curtis, Andy onto the bed in a
fit of frustration due to several factors, including, the CPS investigation, the death of his mother,
Genzel's unwillingness to work because of an illness, the noisiness of his children, and Andy's
vomiting on him.
      Stiles was charged with intentionally or knowingly injuring Andy. CPS investigated Stiles
for the same offense with regard to Antoni, although it later discontinued the investigation for lack
of specific evidence from the medical professionals who treated Antoni that his leg was
purposefully broken by someone else. Evidence of the CPS investigation tended to make the
conclusion more probable that Stiles either intentionally hurt Andy or knowingly threw her on the
bed with a head injury a likely result. See Tex. R. Crim. Evid. 401, 404(b). Therefore, evidence
of the CPS investigation was admissible under rule 404(b), and Stiles's thirteenth point is
overruled.
      In point fourteen Stiles complains that the trial court erred in permitting Dr. Willis L. Starnes,
a physician who examined Andy at Irving Hospital on the date of the offense, to testify about other
extraneous offense evidence, namely, that Andy had been a victim of sexual abuse. Dr. Starnes
testified that he had found recent or "fresh" bruises and tears in the area of Andy's rectum and
anus. He stated further that these injuries were caused by "a blunt object of fairly substantial
diameter being inserted into her anus . . . on several occasions."
      In Stiles's confession he stated that during the three weeks prior to the offense, only he,
Genzel, Destiny, and Antoni had access to Andy. He also stated that Genzel always treated Andy
well and that he did not believe she would have hurt her. These facts strongly indicate that only
Stiles could have been the party to have sexually abused Andy, as Dr. Starnes suggested did occur. 
Stiles's defense to the charged offense was that he never intended to hurt Andy. As stated above,
rule 404(b) allows evidence of extraneous offenses to prove, among other things, intent and the
absence of mistake or accident. Tex. R. Crim. Evid. 404(b). Therefore, the testimony from Dr.
Starnes that Andy had been sexually abused was admissible under rule 404(b) to demonstrate that
Andy's head injury was not the result of any accident but due to an intentional or knowing act on
the part of Stiles that was either designed to cause Andy serious injury or was likely to cause Andy
serious injury. Stiles's fourteenth point is overruled.
      In his fifteenth point of error Stiles complains the trial court erred in overruling his objection
to an allegedly improper jury argument by the State. The relevant portion of the State's closing
argument is as follows:
[STATE]: I submit, Ladies and Gentlemen, that the best case scenario for the defense is . .
. that . . . [Stiles] didn't want this child. He was angry. He was frustrated, fed up with his
problems. And he took out . . . his anger on this child. He threw her down. And he knew,
as we know, when you throw down a child like this, that they're going to be hurt.
 
Consider a more vile alternative. Again, we have only the evidence. We tried to bring you
everything that we have. He took this child into this bedroom and closed the door. You've
seen what was there[.]
 
We know that this child has recent rectal tears consistent with penetration from the exterior,
from a blunt object. Doctor Starnes can't say what: finger, pen[i]s, some blunt object.
 
I would submit, it's a reasonable deduction from the evidence, that he's angry. Whether this
is for some sick pleasure or whether this is just anger, he's striking back at that child that has
made his life all the more uncomfortable. This child starts to cry. This is tough to explain,
if someone comes in and sees him doing something to this child. He has to quiet the child.
 
[DEFENSE]: Objection, Your Honor. This is outside the evidence. Totally outside the
evidence.
 
THE COURT: Members of the Jury, you'll remember the evidence and that's the only thing
you would be guided by.
 
[DEFENSE]: Also, Your Honor, it's inflammatory. We would also ask that you direct the
jury to disregard that last statement.
 
THE COURT: Overruled.

      On appeal, Stiles contends that the portion of the State's closing argument, above, was
improper for two reasons: (1) it was not a reasonable deduction of the evidence, and (2) it was
inflammatory. We note that Stiles failed to pursue his objection that the State's argument went
outside the evidence until he received an adverse ruling from the trial court and, therefore, he
failed to preserve his complaint for our review. Tex. R. App. P. 52(a); Flores v. State, 871
S.W.2d 714, 722-23 (Tex. Crim. App. 1993), cert. denied, 115 S.Ct. 313 (1994). Nevertheless,
in considering Stiles's complaint that the State's argument was inflammatory, we find that the
State's argument was a reasonable deduction of the evidence and, therefore, it was not improper. 
See Willis v. State, 785 S.W.2d 378, 384 (Tex. Crim. App. 1989), cert. denied, 498 U.S. 908,
111 S.Ct. 279 (1990) (the four permissible areas of jury argument are: (1) summation of the
evidence; (2) reasonable deduction from the evidence; (3) answers to arguments from the defense;
and (4) pleas for law enforcement). As we held above, evidence was properly admitted that Stiles
may have sexually abused Andy on several occasions. It was reasonable for the State to argue
from this evidence that a possible motivation for Stiles's decision to throw Andy onto the bed was
that he became angry when she cried during the course of one of his sexual assaults on her. 
Because the State's argument was a reasonable deduction from the evidence it was neither outside
the record nor inflammatory. Stiles's fifteen point is overruled, and the judgment is affirmed.
 
                                                                                 BOBBY L. CUMMINGS
                                                                                 Justice

Before Justice Cummings and
         Justice Vance
Affirmed
Opinion delivered and filed July 17, 1996
Publish