Opinion issued January 31, 2006











In The
Court of Appeals
For The
First District of Texas
 

 
 
NO. 01-03-01314-CR
____________
 
THERAN TREMAYNE BLACKWELL, Appellant
 
V.
 
THE STATE OF TEXAS, Appellee
 

 
 
On Appeal from the 184th District Court
Harris County, Texas
Trial Court Cause No. 932330
 

 
 
O P I N I O N
          Appellant, Theran Tremayne Blackwell, pleaded not guilty to the offense of
indecency with a child. Tex. Pen. Code Ann. § 21.11(a)(1) (Vernon 2003). The jury
found appellant guilty, found true an enhancement paragraph that alleged that 
appellant had a prior felony conviction, and assessed his punishment at confinement
for 30 years. In two points of error, appellant contends that the trial court erred by
admitting evidence of two extraneous offenses and by permitting the State to ask an
improper commitment question in voir dire. Appellant’s third point of error asserts
that his trial attorney rendered ineffective assistance of counsel. We hold that the trial
court did not err by allowing the admission of extraneous offenses as rebuttal
evidence of appellant’s defensive theories at trial, which suggested that appellant
lacked the intent to sexually assault J.H. and that appellant was the victim of a
“frame-up” by J.H.’s grandmother. We further hold that the State’s voir dire
questions were not improper commitment questions and that appellant’s trial attorney
did not render ineffective assistance of counsel at trial. We therefore affirm.
Facts 
          Appellant was related to J.H.’s cousins and had known J.H. since he was very
young. When J.H. was eight or nine years old, he began to visit appellant’s residence
alone and to spend the night there. J.H. lived with his grandmother, Melvina
Stepherson, and made these visits with her permission. J.H. wanted to visit
appellant’s residence because his cousins Glen and Fred Stepherson often went there
to watch movies and to play. 
          One night, while sharing a bed together in appellant’s residence, appellant
woke J.H. up to tell him that he had wet the bed and needed to change his clothes. 
After J.H. changed his clothes and returned to bed, appellant told him to disrobe, but
J.H. refused. Appellant threatened to whip J.H. if he did not take his clothes off and
then “whipped” J.H. when he refused to remove his clothes. J.H. finally complied by
disrobing, and appellant told him to get baby oil from the bathroom. J.H. complied
and returned to bed to find appellant naked. Appellant instructed J.H. to rub baby oil
on appellant’s chest, his “private part,” and his “behind.” Appellant also rubbed
J.H.’s “private part” and “behind” with baby oil. After the sexual contact, appellant
told J.H. not to tell anyone what had transpired. J.H. testified that this conduct
occurred repeatedly at appellant’s apartment over the course of several years. 
          J.H. also described repeated sexual conduct with appellant that occurred in
appellant’s car. J.H. said that appellant gave him alcoholic beverages that caused him
to feel drowsy and dizzy. At appellant’s instruction, J.H. disrobed and rubbed
appellant’s “private part” while appellant rubbed J.H.’s “private part” with one hand. 
Appellant’s other hand was on the steering wheel as he drove the car. 
          J.H. also described repeated sexual conduct that occurred with appellant at
appellant’s recording studio in a room that had what appeared to be cotton on the
walls. Appellant told J.H. to remove his clothes, and, when J.H. complied, appellant
pulled down his own pants and instructed J.H. to rub appellant’s “private part.” 
          When he was eight or nine years old, J.H. reported the sexual misconduct to his
grandmother, Melvina Stepherson, but she did nothing about it because she was in
poor health. J.H.’s mother, however, reported the conduct to police officers when she
learned about J.H.’s allegations upon her release from prison.
          At trial, the State’s case-in-chief consisted of testimony from J.H., who was 13
years old at the time of the trial, his grandmother Melvina, and two police officers
who testified about their investigation of the case. J.H.’s testimony at trial described
the sexual contact with appellant that occurred over the course of several years. In
anticipation of a challenge to J.H.’s credibility by the defense, the State introduced
evidence of J.H.’s prior inconsistent statements that were made to various people, on
audiotape and in writing, in which J.H. claimed that the allegations that he had made
against appellant were not true and that he was falsifying the allegations because he
was jealous of the attention that appellant gave to his cousins Glen and Fred. J.H.
explained during his direct examination by the State that his statements denying the
conduct by appellant were not made voluntarily. Appellant’s attorney cross-examined J.H. about his prior inconsistent statements and motives to lie about
appellant. 
          Melvina testified during direct examination that she was unaware that appellant
had ever had a girlfriend, that she believed J.H. when he initially reported the sexual
misconduct to her, and that J.H. was a “good boy” who got into nothing more than
normal boyhood trouble. Melvina also stated that appellant had purchased a pair of
sneakers for J.H., but she “didn’t think anything of it” because appellant “always
bought things” for her “two grandsons.” She did not give any other details about
appellant’s relationship with her “two grandsons.” Likewise, she did not state, at that
point in the trial, the names of her two grandsons, or whether they were children or
adults. During cross-examination of Melvina, appellant’s attorney introduced
through her that appellant was a good father figure to her other two grandsons and
that appellant had begun a football team for young boys. 
          Appellant’s trial attorney presented the testimony of seven witnesses during
appellant’s case-in-chief. The testimony presented during appellant’s defense at trial
showed the following: (1) J.H. stated in writing and on audiotape that appellant was
not improper with J.H. in any way; (2) J.H. is not a truthful person; (3) J.H. falsified
the allegations because J.H. believed that appellant was mean and because J.H. was
jealous of the attention that appellant gave to J.H.’s cousins, and (4) appellant had
previously had many girlfriends. Appellant’s attorney also introduced testimony from
a district court clerk who said that her records showed that appellant was in jail on the
date of the offense alleged in the indictment. 
          In rebuttal, over appellant’s objections, the State introduced two extraneous
offenses of sexual misconduct by appellant against two young boys, K.S. and C.R. 
K.S. testified that, when he was 13 years old, he was in a music group with two other
boys who were 13 and 15 years of age. The three boys looked in the yellow pages for
a recording studio, called the studio, and ultimately went to the studio where they met
appellant. The boys visited the studio seven times in an attempt to record a song, and
each time they visited, other people were in the studio recording songs. Appellant
never asked the boys for money to record at his studio. During the seventh visit to
the studio, the three boys accompanied appellant to a windowless, soundproof room
that had what looked like cotton on the walls, where the group practiced singing a
song. Appellant then said that he wanted to hear each of the boys individually. When
K.S. was alone with appellant in the soundproof room, appellant told him that he had
to sing louder. Appellant told him that if he “jacked off or bust a nut” it would make
him sing louder. K.S. said, “No.” Appellant then suggested that K.S. take off his
shoes, which K.S. did. Appellant told K.S. to sing the verse again, and appellant
again told K.S. that he was not satisfied with the singing. Appellant then told K.S.
to take off his shirt. K.S. initially refused, but then took his shirt off because he
believed that he might then be allowed to leave. At appellant’s instruction, K.S. again
sang the song, which appellant said was a bit better. Appellant, however, continued
to request that K.S. disrobe. Appellant told K.S. to take off his pants, and K.S.
complied. K.S. explained that, because appellant was standing right by the locked
door, he did not feel that he could leave. When appellant told K.S. to take his boxer
shorts off, K.S. felt that he might cry because he feared what appellant wanted from
him. Before K.S. took the boxer shorts off, appellant told him to come over to him. 
Appellant then put his arm around K.S. and started rubbing his stomach. Appellant
showed K.S. some money that he had in his sock, stating that he would give K.S. two
hundred dollars if he took the boxer shorts off. K.S. took the boxer shorts off, and as
he stood naked, appellant told him to sing the verse again, while appellant watched. 
After K.S. finished the song, appellant told K.S. to “jack off,” but K.S. refused. 
Appellant continued to ask K.S. to masturbate himself, and appellant asked K.S. if
appellant could put his hand down K.S.’s shorts. K.S. continued to refuse appellant’s
requests. Appellant finally told K.S. that he could put his clothes on. After K.S. put
his clothes on, appellant hugged K.S. and asked if K.S. loved him. When K.S. said
“no,” appellant laughed and told K.S. that he could leave. K.S. immediately reported
the incident to his mother and never again saw appellant, although appellant called
K.S.’s house a few days after the incident.
          C.R. testified that when he was 12 years old, appellant took him and J.H.,
C.R.’s neighborhood friend, to the movies. Appellant drove the boys to the movies,
paid for their admission, and bought each of the boys a bag of popcorn. After the
movie, instead of taking C.R. and J.H. home, as C.R. had expected, appellant claimed
that he was sick and drove the boys to his apartment. Appellant told C.R. to go into
the apartment with him because it would take a while. Appellant told C.R. to leave
J.H. in the car because J.H. was asleep. Appellant offered C.R. water to drink and a
video game to play downstairs, while appellant went up stairs for a short while. 
Appellant then called C.R. upstairs and told C.R that he needed to become a man. 
C.R. entered appellant’s bedroom and saw a female blow-up doll on the floor.
Appellant told C.R. that he would not be allowed to leave until C.R. had sex with the
doll. C.R. was scared and said “no,” but appellant again repeated that he would not
be allowed to leave. Appellant told C.R. to take all of his clothes off, and C.R.
complied. Appellant told C.R., using crude language, to put his male sexual organ
into the doll’s female sexual organ, and to continue until C.R. ejaculated. Appellant
then told C.R., again using crude language, to put his male sexual organ into the
doll’s anus. C.R. complied until he ejaculated. At that point, appellant told C.R. that
now he was a man. Appellant held a video camera to record the incident with the
doll. C.R. clothed himself and returned with appellant to appellant’s car, where J.H.
had remained for the 30 minutes that C.R. had been in the apartment with appellant. 
          Appellant’s attorney then rebutted the State’s rebuttal, by introducing evidence
from six boys who had frequently spent time with appellant, who said that appellant
had not had any sexual contact with them. Appellant’s attorney also presented the
testimony of appellant’s former girlfriend and recalled Melvina to question her about
her veracity and motives to testify against appellant. 
Extraneous Offenses
          In his first issue, appellant contends that the trial court erred by admitting into
evidence the State’s rebuttal testimony of K.S. and C.R. because their testimony
concerned extraneous offenses and was offered only to show that appellant was “a
sexual predator generally and that he was acting in conformity therewith during the
commission of the offenses alleged in the indictment.” At trial, appellant objected
under Texas Rules of Evidence 403 and 404(b). See Tex. R. Evid. 403, 404(b). 
Appellant asserted at trial, as he does here on appeal, that under rule 404(b), the
extraneous offense evidence was inadmissible because (1) the only basis for
admission of the extraneous offenses was as character-conformity evidence,
specifically, to label appellant as a “sexual predator generally”; (2) there were
insufficient distinguishing characteristics common to the extraneous offenses and the
charged offense for the extraneous offense evidence to be probative on the issue of
appellant’s intent concerning the charged offense; (3) the extraneous offenses did not
conform to any purpose permissible under rule 404(b), such as motive, opportunity,
intent, preparation, plan, knowledge, identity, or absence of mistake or accident of the
defendant, and (4) the State introduced the topics at issue into the trial and thus the
topics were not properly subject to rebuttal by the State. See Tex. R. Evid. 404(b). 
Additionally, appellant asserted at trial, as he does here on appeal, that the
extraneous-offense evidence should be excluded under rule 403 because its probative
value was substantially outweighed by the danger of unfair prejudice due to the trial
court’s failure to tailor the limiting instruction to the actual theory under which the
extraneous offense was admitted. See Tex. R. Evid. 403.          
          We review a trial court’s admission of extraneous offense evidence for an
abuse of discretion. Rankin v. State, 974 S.W.2d 707, 718 (Tex. Crim. App. 1996)
(op. on reh’g); Wolfberg v. State, 73 S.W.3d 441, 443 (Tex. App.—Houston [1st
Dist.] 2002, pet. ref’d). A trial court does not abuse its discretion as long as its
decision to admit evidence is within the “zone of reasonable disagreement.” 
Montgomery v. State, 810 S.W.2d 372, 391–92 (Tex. Crim. App. 1991) (op. on
reh’g). Further, a trial court’s decision regarding admissibility of evidence will be
sustained if correct on any theory of law applicable to the case, even when the court’s
underlying reason for the decision is wrong.


 Romero v. State, 800 S.W.2d 539,
543–44 (Tex. Crim. App. 1990) (citing Spann v. State, 448 S.W.2d 128 (Tex. Crim.
App. 1969)).
          Evidence may be excluded under rule 403 if the probative value of the evidence
is substantially outweighed by the danger of unfair prejudice. Tex. R. Evid. 403;
Moses v. State, 105 S.W.3d 622, 626 (Tex. Crim. App. 2003) (citing Montgomery,
810 S.W.2d at 387). Courts should consider the following factors under a Rule 403
analysis: (1) the strength of the extraneous offense evidence to make a fact of
consequence more or less probable; (2) the potential of the extraneous offense to
impress the jury in some irrational but indelible way; (3) the time during trial that the
State requires to develop evidence of the extraneous misconduct; and (4) the need by
the State for the extraneous evidence. Wheeler v. State, 67 S.W.3d 879, 888 (Tex.
Crim. App. 2002). 
          Rule 404(b) states that evidence of extraneous offenses is not admissible at the
guilt-innocence phase of a trial to prove that a defendant committed the charged
offense in conformity with a bad character. Tex. R. Evid. 404(b); Nobles v. State,
843 S.W.2d 503, 514 (Tex. Crim. App. 1992). Extraneous offense evidence may be
admissible, however, when it has relevance beyond character-conformity, for
example, to show proof of motive, opportunity, intent, preparation, plan, knowledge,
identity, or absence of mistake or accident. Id.; Moses, 105 S.W.3d at 626. Rebuttal
of a defensive theory is “one of the permissible purposes for which relevant evidence
may be admitted under Rule 404(b).” Moses, 105 S.W.3d at 626. 
          Extraneous offense evidence may be properly admitted to “rebut the various
defensive theories” propounded by a defendant, but it may not be admitted to address
a false impression left by the defendant. See Wheeler, 67 S.W.3d at 887–88. When
a witness leaves the false impression that the accused is not the type of person to
commit a certain type of offense, the only proper method to confront the evidence is
cross-examination of the witness. Id. at 885–86. Appellant never objected at trial,
nor has he asserted on appeal, that the extraneous offense evidence was inadmissible
to correct a false impression left by appellant. 
          In Wheeler, the court held that, although the extraneous offense evidence that
Wheeler had sexually assaulted a young girl at the beach in the presence of others was
inadmissible to correct a false impression left by Wheeler, the evidence was
admissible to rebut his defensive theory—that he lacked an opportunity to sexually
assault his daughter’s friend because he was never alone with her, that it was
impossible for him to abuse her in a room full of people, and that he was the victim
of a conspiracy or frame-up motivated by greed. Id. at 887. As in Wheeler, the State
here asserted alternate reasons why the rebuttal evidence was admissible. See id. at
886. Also as in Wheeler, one of the State’s asserted reasons was erroneous,
specifically, that the extraneous offense evidence was admissible to confront the
false-impression evidence.


 See id. at 885. But again, as in Wheeler, the State offered
an alternate reason, that the extraneous offense evidence was admissible to rebut
defensive theories propounded by the defendant. See id. at 888–89. We conclude,
therefore, that although the extraneous offense evidence would be inadmissible to
confront false-impression evidence, the State’s alternate reason, that the extraneous
offense evidence was admissible to rebut defensive theories propounded by the
defendant, was a proper basis for the admission of the extraneous offense evidence,
as long as the evidence complied with rules 404(b) and 403. See id. 
Appellant’s Defensive Theories
          We conclude that two of appellant’s many defensive theories introduced at
trial—that appellant lacked the intent to have sexual contact with J.H. and that
appellant was the victim of a frame-up by J.H. and Melvina—were properly subject
to rebuttal by the State. As a preliminary matter, however, we must address
appellant’s assertion that the State cannot open the door to evidence that it later
seeks to rebut.
          1. State’s Introduction of Evidence
          On appeal, appellant generally contends that the State may not rely on its own
questioning to open the door to collateral matters and extraneous offenses that would
otherwise be inadmissible, but appellant does not refer specifically to any theory. 
At trial, appellant argued to the trial court that, because the State introduced evidence
concerning appellant’s lack of girlfriends, the State could not open the door to
evidence responsive to that issue.  
          As a general rule, the defensive theory that the State wishes to rebut through
the use of extraneous offense evidence must be elicited on direct examination by
defense and may not by elicited by “prompting or maneuvering” by the State. 
Wheeler, 67 S.W.3d at 885; Shipman v. State, 604 S.W.2d 182, 185 (Tex. Crim. App.
1980) (stating that State “may not rely on its own questioning” to get into collateral
matters, extraneous offenses, and bad acts that “would otherwise be inadmissible”). 
          The record supports appellant’s assertion that the State introduced evidence
that appellant had never had a girlfriend. Having introduced appellant’s lack of
girlfriends into evidence, the State could not introduce rebuttal evidence concerning
that topic. See id. The two defensive theories, however, that we conclude were
properly subject to rebuttal by the State—that appellant lacked the intent to have
sexual contact with J.H. and that appellant was the victim of a frame-up by J.H. and
Melvina—were not pertinent to the issue of whether appellant lacked girlfriends,
which was the issue initially introduced by the State. The record shows that
appellant, rather than the State, introduced the defenses that he lacked intent to have
sexual contact with J.H. and that he was the victim of a frame-up. 
          2.       Lack of Intent
          The State asserts on appeal, as it did at trial, that the extraneous offenses are
admissible to rebut the defensive theory that appellant lacked the intent to have
sexual contact with J.H.


 The defense asserted the theory that appellant had no intent
to have sexual contact with J.H. because his relationship with young boys consisted
only of doing kind acts for them as a father figure. During the prosecutor’s
arguments to the trial court seeking a ruling that would allow her to introduce the
rebuttal-extraneous-offense evidence, the State’s attorney argued that “it goes to
show clearly his intent with the Complainant in this case. . . . They are implying that
he just helps boys because he let Glen and Fred live with him and he did this . . . to
be kind. And I think it goes to rebut that.”
          The record reflects that appellant introduced the defense that he lacked the
intent to commit a sexual offense against J.H. during his cross-examination of
Melvina Stepherson by questioning her as follows:
[Appellant’s attorney:] Didn’t [appellant] take care of Glen and
Fred?
 
[Melvina Stepherson:]Yeah, for about two years.
 
[Appellant’s attorney:] Okay. They actually lived [with appellant],
Blackwell, right?
 
[Melvina Stepherson:] (Nods in the affirmative.)
 
. . . .
 
[Appellant’s attorney:] [Appellant] more or less helped raise those
boys [Glen and Fred]?
 
[Melvina Stepherson:]After they were—teenage, yes.
 
[Appellant’s attorney:] And he provided for them?
 
[Melvina Stepherson:]They said—yeah, he did, when they stayed
with him.
 
          [Appellant’s attorney:]    He was almost like a father to those boys,
wasn’t he?
 
          [Melvina Stepherson:]     While they were staying with him, yes.


 
 
          Appellant’s attorney continued to pursue this defensive theory through Glen
Stepherson. During the direct examination of Glen Stepherson, appellant’s attorney 
questioned him as follows:
[Appellant’s attorney:]Now why was it that [appellant] was taking
care of you and your brother?
 
[Glen Stepherson:] Because when we were little, we never—we
never got that much stuff when we were
little.
 
[Appellant’s attorney:]But why was he taking care of you, as
opposed to, let’s say, your mother or father?
 
[Glen Stepherson:]Because I never knew my dad until I was 7 .
. . . And my mom was always in the streets
or in jail somewhere. 
 
[Appellant’s attorney:]Okay. And it was your grandmother that let
[appellant] raise you; is that right?
 
[Glen Stepherson:[Her and my mother.
 
[Appellant’s attorney:]And your mother. Okay. And [appellant]
would discipline you from time to time just
like a regular parent; is that right?
 
[Glen Stepherson:]Yes. Sir.
 
          [Appellant’s attorney:]    Okay. Did he get you back in school and try to set
you on the right track?
 
[Glen Stepherson:]Yes, sir.
 
[Appellant’s attorney:]Okay. Do you think he did a good job of
raising you?
 
[Glen Stepherson:]Yes, sir.
 
By asserting that appellant was a like a regular parent who did a good job of raising
two other young boys, appellant impliedly suggested that he lacked the intent to have
sexual contact with J.H. The implication of the evidence that described appellant’s
role as a father to Glen and Fred, in conjunction with evidence that suggested that 
appellant assumed a similar parental-type role with J.H., was that appellant lacked
the intent to commit a sexual offense against J.H. 
          Although the questioning of these witnesses may have only impliedly
suggested that appellant lacked the intent to commit a sexual offense against J.H.,
the defense’s closing argument to the jury directly asserted that appellant lacked that
intent. In his closing argument, appellant’s attorney confirmed that suggestion by
arguing that, if appellant had intended sexual conduct with J.H., the contact would
have escalated into sexual assault, rather than remain at the level of masturbation-type conduct only. Appellant’s attorney stated:
 
The other thing that struck me as strange about the case, they are
claiming it took place over a five-year period and, for some reason, the
only thing the defendant would do would be either touch the penis or
have his penis touched. I mean does it really make any sense that if the
defendant was a pedophile, as they are apparently trying to claim, that’s
all that he would do over a five-year period? Doesn’t it make more
sense that the sexual activity would escalate, there would be an attempt
to have anal or oral sex? There was never any testimony about that. I
mean, the facts of the case just don’t make any sense. 
 
          The defensive theory that appellant lacked the intent to commit the offense
was thus introduced into the case and was subject, therefore, to rebuttal by the State. 
See Tex. R. Evid. 404(b); Moses, 105 S.W.3d at 626. 
          2.       Appellant as Victim of Frame-Up
          Alternatively, and as an independent reason that would allow the admission
of the extraneous offense evidence as rebuttal evidence, we conclude that the
evidence was admissible to rebut appellant’s defensive theory that he was the victim
of a frame-up. As the State’s attorney stated at trial, the extraneous offenses were
admissible “to rebut all the [defensive] theories” because appellant “opened the
door” to the evidence. 
          The record demonstrates that appellant introduced the defensive theory that
he was the victim of a frame-up by Melvina Stepherson, who pressured J.H. to
falsely accuse appellant because there was bad blood between his family and her
family. Appellant’s defensive theory raised the issue that Melvina Stepherson had
threatened to send J.H. to reform school and have perjury charges filed against him
if he recanted the allegations against appellant. The record reflects that appellant’s
attorney introduced this theory into the trial when he cross-examined Melvina
Stepherson and J.H., and he continued to pursue the theory in closing arguments to
the jury, which included the following statement:
He [J.H.] has been pressured by his grandmother to stick with the story
. . . . [Melvina Stepherson and J.H.] are discussing the story together
to get the story straight, basically. You have heard the testimony that
they told him, “Look, if you say that this didn’t happen, you could go
to reform school over this case. You could be in serious trouble.” 
 
          The record thus demonstrates that appellant propounded two defensive
theories—that he lacked the intent to commit a sexual offense against J.H. and that
he was the victim of a frame-up by Melvina Stepherson—that were subject to
rebuttal evidence by the State, as long as the evidence also complied with the
specific requirements under Rule 404(b) and Rule 403. See Tex. R. Evid. 404(b),
403. 
Rule 404(b)
          As noted more fully above, to be admissible under Rule 404(b), the extraneous
evidence must have probative value beyond character conformity. Tex. R. Evid.
404(b). To be probative, the extraneous offense evidence admitted to rebut a
defensive theory must be similar to the charged offense. See Wheeler, 67 S.W.3d at
888–89 (holding extraneous offense similar to charged offense because in both cases
defendant reached underneath young girl’s outer clothing and touched her private
parts while family member was nearby); Plante v. State, 692 S.W.2d 487, 492–93
(Tex. Crim. App. 1985) (holding that high degree of similarity between extraneous
and charged offense used in cases proving modus operandi not required when
purpose of proof is to show intent); Johnston v. State, 418 S.W.2d 522, 525–26 (Tex.
Crim. App. 1967) (holding that trial court did not abuse discretion by allowing
evidence of extraneous offense to rebut defendant’s theory of frame-up under
circumstances showing that charged offense concerned victim who visited
defendant’s apartment several times during which defendant talked victim into
“hypnotizing him with a vibrator” and “kissing him on the stomach” to help victim
“with girls, sex and stuff,” because extraneous offense concerned similar facts that
defendant “played around” with another boy in car and asked boy to spend night and
have sexual relations); Dennis v. State, Nos. 01-04-00514-CR—00516-CR, slip op.
at 10–11, 2005 WL 1606556 at *5 (Tex. App.—Houston [1st Dist.] July 7, 2005, pet.
ref’d) (holding that extraneous offense evidence admitted to rebut defensive theory
of frame-up need not be signature crime or nearly identical to charged offense; rule
404(b) requires only similarity to charge offense).
          At trial, the State’s theory for admissibility of the extraneous offense evidence
in the rebuttal phase of trial was that the extraneous offenses were sufficiently
similar to the charged offense to be probative on the issue of appellant’s intent with
J.H. The State explained to the trial court that appellant used the same means to
entice both K.S. and C.R. to be alone with him and that appellant gained each boy’s
trust by giving items or services of value so that appellant would be alone with each
boy to commit sexual acts. As the State’s attorney told the trial court,
. . . it’s the same habit that he is showing by buying them things, by
doing nice things for them. Like in [K.S.’s] case, you know, he offered
to let them record for free when clearly it was his business, he had them
over there. With [C.R.], it was just a friend of J.H.’s; and he took them
to the movies, to Celebration Station, [and] bought him things. I mean,
I think it all goes to his habit about how he ingratiated himself with
these boys and then uses that as a vehicle to commit sexual acts against
them.
 
          The record shows sufficient similarities between the extraneous offenses and
the charged offense to make the extraneous offenses probative evidence of
appellant’s intent with J.H. With respect to K.S., the record reflects the following
similarities between appellant’s conduct with him and J.H.: (1) both K.S. and J.H.
are young boys: K.S. was about 13 years of age and J.H. was between the ages of 8
and 12 at the time of the conduct with appellant; (2) appellant gave gifts or services
of value to both K.S. and J.H.: he purchased sneakers and other items for J.H. and
allowed K.S. and his friends to record music at his studio free of charge; (3) both
boys were taken to a room inside appellant’s recording studio that had a cotton-looking substance on the walls; (4) both boys were told to take their clothes off; (5)
masturbation, i.e., using a hand to touch or to attempt to touch a male sexual organ,
was the only form of sexual conduct with both boys; (6) the sexual conduct took
place when other people were present in the recording studio; (7) both boys were
threatened or intimidated by appellant to get them to comply with appellant’s
requests: J.H. was told he would get a “whipping,” and K.S. felt that he could not
leave while appellant stood by the locked door; (8) the offense against K.S. took
place in July, 2000, which was in the same October, 1998, to September, 2002, time
period in which the offenses against J.H. took place.
          The only dissimilarities between appellant’s conduct with K.S. and J.H.
concern minor details of the sexual contact. Specifically, during the assault of J.H.
at the recording studio, appellant pulled his own pants down and had J.H. rub
appellant’s private part. But, with K.S., appellant rubbed K.S.’s stomach, told K.S.
to masturbate himself, and asked K.S. for permission to put his hand down K.S.’s
shorts. Despite these minor differences in the specifics of the masturbation conduct,
there are sufficient similarities between the sexual conduct involving J.H. and K.S.
for K.S.’s extraneous offense evidence to be probative as rebuttal evidence to show
appellant’s intent to commit a sexual act with J.H.
          Concerning the similarities between the offenses against J.H. and C.R., the
record shows the following: (1) both C.R. and J.H. are young boys: C.R. was about
13 years of age and J.H. was between the ages of 8 and 12 at the time of the conduct
with appellant; (2) appellant purchased gifts or services of value for both J.H. and
C.R.: he purchased sneakers and other items for J.H. and purchased a movie ticket
for C.R. and took him to Celebration Station; (3) both boys had sexual experiences
with appellant in the bedroom of his apartment; (4) both boys were told to take their
clothes off; (5) appellant threatened or intimidated both boys to get them to comply
with appellant’s requests: J.H. was told he would get a whipping if he did not
disrobe, and C.R. was told that he would not be allowed to leave until he had sex
with a blow-up doll; and (6) the nature of the sexual conduct with both boys was
masturbation type conduct only, i.e., appellant had J.H. touch appellant’s genitals
with J.H’s hand and appellant touched J.H.’s genitals with appellant’s hand, and
appellant directed C.R. to ejaculate through self-gratification with a blow-up doll. 
          The actual details of the sexual contacts are the only dissimilarities between
appellant’s conduct with C.R. and J.H. With J.H., appellant had J.H. masturbate
appellant, and appellant masturbated J.H.; with C.R., appellant did not touch himself
or have C.R. touch appellant, but instead directed C.R. to have vaginal and anal
intercourse with the female blow-up sexual doll, which appellant recorded on
videotape. Yet, despite differences in the details of the actual masturbation conduct,
the circumstances show a sufficient number of similarities to appellant’s conduct 
with J.H. to be probative of appellant’s intent to commit a sexual act with J.H. See
Plante, 692 S.W.2d at 492–93 (holding that high degree of similarity not required
when purpose of proof is to show intent); Johnston, 418 S.W.2d at 525–26 (holding
that extraneous offenses that involved different sexual acts were sufficiently similar
to be admissible to rebut frame-up defense). 
          The two extraneous offenses that the trial court admitted into evidence here
were probative of appellant’s intent because they were similar to appellant’s
misconduct with J.H. and thus rebutted appellant’s defensive theories that he lacked
the intent to commit a sexual offense against J.H. and that appellant was the victim
of a frame-up by Melvina Stepherson. Although the rebuttal extraneous offenses are
not signature crimes by appellant and differ in the details of the sexual criminal
offenses he committed, they are sufficiently similar to the charged offense to be
probative evidence of appellant’s intent to commit a sexual offense against J.H. and
to refute the theory that appellant was the victim of a frame-up by Melvina
Stepherson.
Rule 403
          The rebuttal extraneous offense evidence also met the requirements of rule 403 
of the Rules of Evidence because the probative value of the evidence was not 
substantially outweighed by the danger of unfair prejudice. See Tex. R. Evid. 403;
Moses, 105 S.W.3d at 626 (citing Montgomery, 810 S.W.2d at 387). Further, the
factors for admission of the rebuttal extraneous offense evidence show that rule 403
does not preclude admission of the evidence. See Wheeler, 67 S.W.3d at 888.          The first factor, the strength of the extraneous offense evidence to make a fact
of consequence more or less probable, weighs strongly in favor of admissibility. The
extraneous offense evidence was probative of appellant’s intent to commit the sexual
offense against J.H. by showing that appellant had a similar sexual intent with K.S.
and C.R., as well as a similar pattern of enticing boys to accompany him alone after
giving valuable gifts to them. Additionally, because nothing in the record indicates
that either victim of the two rebuttal extraneous offenses had any motive to frame
appellant for the sexual allegations made against him, the rebuttal evidence was also
probative of whether Melvina Stepherson was framing appellant for the sexual
offense committed here.
          The second factor requires that we examine the rebuttal-extraneous-offense
evidence for its potential to impress the jury in some irrational but indelible way. 
The trial court’s instructions to the jury are a factor to consider in determining
whether the jury considered the extraneous-offense evidence improperly, i.e., as
character conformity evidence, or properly, as evidence to rebut a defensive theory
or some other permissible reason under rule 404(b). See Owens v. State, 827 S.W.2d
911, 916-17 (Tex. Crim. App. 1992). 
          The trial court instructed the jury in this case as follows: 
You are further instructed that if there is any evidence before you
regarding the defendant’s committing an alleged offense or offenses
other than the offense against him in the indictment in this case, you
cannot consider such evidence for any purpose unless you find and
believe beyond a reasonable doubt that the defendant committed such
other offense or offenses, if any, and even then you may only consider
the same in determining the motive, opportunity, intent, preparation,
plan, knowledge, identity, or absence of mistake or accident of the
defendant, if any, in connection with the offense, if any, alleged against
him in the indictment and for no other purpose. 
 
The trial court’s instruction properly limited the jury’s reliance on the extraneous
offense evidence to issues that appellant raised, specifically, his motive and intent
to commit the sexual offense against J.H. The trial court’s instruction for the jury
to consider the extraneous offense in determining appellant’s preparation, plan,
opportunity, knowledge, identity, or absence of mistake or accident amounted to
surplusage that the jury could readily disregard because those issues were not
pertinent to the trial. Although the charge did not address appellant’s defensive
theory, that he was the victim of a frame-up by Melvina Stepherson, the charge
specifically limited the extraneous offense evidence to issues other than character
conformity. Therefore, although not as narrowly tailored to the specific issues
involved as it could have been, the charge correctly instructed the jury to limit its use
of the extraneous offense evidence to issues that were properly before it—the intent
and motive of appellant to commit the offense against J.H.
          The jury charge here is unlike the charges in Owens v. State and Daggett v.
State that the Court of Criminal Appeals held were improper. See Owens, 827
S.W.2d at 917; Daggett, No. PD-0503-03-CR, 2005 WL 3408057, at *1 (Tex. Crim.
App. 2005). In Owens, the trial court erred by instructing the jury to consider
extraneous evidence only for the limited purpose of “determining the system of the
Defendant” because no evidence at trial showed that the extraneous offense was the
system or unusual handiwork of defendant, no issue was raised about defendant’s
“identity or lack of mistake,” and the only evidentiary issue at trial pertained to an
implied frame-up defensive theory, an issue not included in the jury charge. See
Owens, 827 S.W.2d at 917. In Daggett, the trial court erred by instructing the jury
to consider the extraneous offense evidence only for the limited purposed of
“determining the common plan or scheme” of the defendant because no evidence at
trial showed that the extraneous offense was the plan or scheme of the defendant and
the extraneous offense was only admissible to rebut “appellant’s blanket statement
of good conduct with minors,” an issue not included in the jury charge. Daggett, No.
PD-0503-03-CR, 2005 WL 3408057, at *6. In Owens and in Daggett, the only
limitation on the jury’s consideration of the extraneous offense related to an issue
that was not raised by the evidence at trial. See id.; Owens, 827 S.W.2d at 913. 
Here, however, the jury was properly instructed to consider the extraneous offense
evidence in determining the intent and motive of appellant with J.H., issues that were
raised by the evidence before the jury. Moreover, the charge here, unlike Owens and
Daggett, instructed the jury to consider the evidence “for no other purpose” than as
evidence of “motive, opportunity, intent, preparation, plan, knowledge, identity, or
absence of mistake or accident of the defendant,” and the jury was therefore by
implication instructed not to consider the extraneous offense evidence as substantive
evidence of appellant’s guilt. The concern in Owens and Daggett, that the jury
charge limited the extraneous offense evidence to an impermissible consideration
only, is not present here. The jury charge here properly instructed the jury to
consider the extraneous offense evidence in determining the motive and intent of
appellant with J.H., and it limited the jury’s use of the evidence to use other than as
substantive evidence of appellant’s guilt. 
          The closing arguments by both attorneys here also explained that the jury
could not consider the extraneous offenses as character-conformity evidence. The
State emphasized that the jury could not consider the extraneous offense evidence
as showing that “because he did something to the other boys he must have done it
to J.H.” Additionally, the State correctly informed the jury that it could consider the
extraneous offense evidence only as evidence that rebutted the defensive theories.


 
Appellant’s attorney also correctly informed the jurors that they “cannot convict just
based on the fact that you heard those other cases” and that the jury had to “separate
those cases out and focus on the J.H. case and ask . . . [d]id the State prove its case
beyond a reasonable doubt?”



          In summary, the jury instruction here served to inform the jurors that they
could consider the extraneous offense evidence only for purposes other than
character conformity, and both attorneys thoroughly explained both the charge and
the court’s instruction to consider the extraneous offense evidence within those
limited parameters. The jury here was therefore adequately apprised that it could
rely on the extraneous offense evidence solely for other purposes than character-conformity evidence. 
          In further analyzing the second factor, which requires an assessment of
whether the rebuttal extraneous offense evidence had the potential to impress the
jury in some irrational but indelible way, the record shows that the testimony was not
overly graphic, although the nature of the sexual offenses was prejudicial because
of the emotional weight associated with them. Taking that prejudicial effect into
consideration, however, and weighing it against the trial court’s instructions in the
jury charge and both attorneys’ closing arguments, this factor weighs only slightly
in favor of excluding the extraneous offense evidence. 
          The third factor evaluates the time during trial that the State required to
develop evidence of the extraneous misconduct. The record here shows that
testimony concerning the extraneous offenses was not unduly lengthy. The details
of the extraneous offense evidence were presented only through the testimony of
K.S. and C.R. In addition, two police officers gave very brief testimony concerning
why charges were not immediately filed for the extraneous offenses involving K.S.
and C.R. This factor is neutral and favors neither admissibility nor exclusion of the
evidence.
          The fourth and final factor examines the State’s need for the extraneous
evidence. This factor weighs heavily in favor of admissibility here. The State
presented J.H., Melvina Stepherson, and two police officers, who testified about their
investigation after J.H. reported to them. At the time of trial, J.H. was a 13-year-old
boy. His testimony was extensively impeached by many defense witnesses stating
that he was not a credible person; by his own admission that he lied 50 percent of the
time; by prior statements that he made in writing, on audiotape, and to various
witnesses, stating that he had no sexual experiences with appellant; and by assertions
that jealousy over appellant’s attention towards Glen and Fred Stepherson motivated
his accusations. Melvina Stepherson’s testimony was impeached by her admission
that she did not report the offense to police officers when J.H. first reported it to her,
and called into question by the defense’s allegation that she was framing appellant. 
There was neither physical evidence to connect appellant to the offense against J.H.,
nor any eyewitnesses. Likewise, there was no evidence, other than J.H.’s and
Melvina Stepherson’s testimony, to establish appellant’s guilt for the offense against
J.H. 
          Considering all four factors together, although the second factor here would
support excluding the extraneous offense evidence, the first and fourth factors weigh
heavily in favor of admissibility. The evidence was highly probative as rebuttal
evidence against the defensive theories, lack of intent and frame-up, and the State’s
need for the evidence was strong. Yet, the trial court’s jury charge and both the
prosecutor and appellant’s counsel’s closing arguments instructed the jury that it
could not convict appellant based solely on a belief that he had committed the two
extraneous offenses and acted in conformity with those offenses but could consider
those offenses as evidence of appellant’s intent with J.H. Because the probative
value of the extraneous offense rebuttal evidence was not, therefore, substantially
outweighed by the danger of unfair prejudice, the trial court did not abuse its
discretion by admitting the evidence. See Moses, 105 S.W.3d at 627 (holding that
trial court’s admission of extraneous evidence is reviewed for abuse of discretion).
          We hold that the extraneous offense evidence was properly admitted to rebut
appellant’s defensive theories, and the evidence was admissible under rules 404(b)
and 403. We overrule appellant’s first point of error.
Commitment Question
          In his second point of error, appellant contends that the trial court erred by
allowing the State, over his objection, to pose an improper commitment question to
the venire panel and by excusing a juror who responded to the State’s question. 
Appellant further complains that the trial court erred by allowing the State to ask
whether the prospective jurors could convict upon the testimony of one male, child
witness, as the testifying victim in a sexual assault case.
          Questions during voir dire are proper if they seek to discover a juror’s views
on an issue applicable to the case. Barajas v. State, 93 S.W.3d 36, 38 (Tex. Crim.
App. 2002) (citing Smith v. State, 703 S.W.2d 641, 643 (Tex. Crim. App. 1985)). 
Voir dire examination permits the parties to assess the desirability of prospective
jurors and to select a “competent, fair, impartial, and unprejudiced jury[.]” Staley v.
State, 887 S.W.2d 885, 896 (Tex. Crim. App. 1994) (citation omitted). Because a
trial court has broad discretion over the process of selecting a jury, an appellate court
should not disturb a trial court’s ruling on the propriety of a particular question
during voir dire absent an abuse of discretion. Barajas, 93 S.W.3d at 38.
          An attorney may not, however, “attempt to bind or commit a venire member
to a verdict based on a hypothetical set of facts.” Lydia v. State, 109 S.W.3d 495,
497 (Tex. Crim. App. 2003). “Commitment questions are those that commit a
prospective juror to resolve, or to refrain from resolving, an issue a certain way after
learning a particular fact.” Standefer v. State, 59 S.W.3d 177, 179 (Tex. Crim. App.
2001). While these types of questions generally “elicit a ‘yes’ or ‘no’ answer, an
open-ended question can be a commitment question if the question asks the
prospective juror to set the hypothetical parameters for his decision-making.” Id. at
180. Commitment questions that attempt to bind prospective jurors to a position,
using a hypothetical or otherwise, are improper and “serve no purpose other than to
commit the jury to a specific set of facts before the presentation of any evidence at
trial.” Lydia, 109 S.W.3d at 497.
          Not all commitment questions, however, are improper. Standefer, 59 S.W.3d
at 179–83; Sanchez v. State, 165 S.W.3d 707, 712 (Tex. Crim. App. 2005) (stating,
“An improper commitment question attempts to create a bias or prejudice in the
venireman before he has heard the evidence, whereas a proper voir dire question
attempts to discover a venireman’s preexisting bias or prejudice.”). In Standefer, the
Texas Court of Criminal Appeals articulated a three-prong test for determining
whether a voir dire question calls for an improper commitment. Standefer, 59
S.W.3d at 179–83. The first prong requires the trial court to decide whether a
particular question is a commitment question. Id. at 179–81. If the court determines
that a particular question is a commitment question, the second prong requires the
court to consider whether the question leads to a valid challenge for cause. Id. at
181–82. If the question meets the “challenge for cause” requirement, the third prong
requires the court to determine whether the question includes only those facts
necessary to test whether a prospective juror is challengeable for cause. Id. at
182–83.
          It is proper for the State to ask during voir dire if jurors can convict on the
testimony of one witness if the jurors believe that witness beyond a reasonable doubt
on all of the necessary elements that establish an offense because a negative answer
by a juror to the question makes the prospective juror challengeable for cause. See
Castillo v. State, 913 S.W.2d 529, 533 (Tex. Crim. App. 1995) (holding juror
challengeable for cause because juror would not convict on basis of single witness’s
testimony even if testimony sufficient to convince juror of guilt beyond a reasonable
doubt).
          During voir dire, the following exchange occurred:
          [Prosecutor:]                    So, the law says that you can look at evidence—if
I can prove my case, my indictment, through one
witness, the law says if you believe that witness
beyond a reasonable doubt, and that witness can
prove each and every element of the indictment,
you can find the person guilty based on that
witness’ testimony. Okay? So, let’s go row by row
and find out how you feel about what the law says
with regard to one witness, okay? How do you
feel? Can you follow that law?
 
          [Appellant’s attorney:]    Your honor, excuse me. I would object to the
State—I would object to the voir diring on the issue
of whether they can convict on the testimony of one
witness and one witness alone. That’s improper
voir diring, asking a jury to commit to a certain set
of facts.
 
This was the sole objection by appellant’s attorney during voir dire to any question
about the “one witness rule”—that the testimony of one witness is sufficient to
convict if the jurors believe that witness beyond a reasonable doubt. See Castillo,
913 S.W.2d at 533–34. By objecting to this question at trial, appellant has preserved
the right to complain about it on appeal, but appellant has waived his other voir dire
complaints because he failed to object to those questions at trial.



          The State’s voir dire asked the jurors if they could follow the law that allows
a jury to convict on the testimony of one witness that has established all of the
elements of the offense beyond a reasonable doubt. In considering the first prong
of the Standefer test, we note that the question could be answered with a “yes” or
“no,” and that the question asked the jurors to commit to the law that allows for a
jury to convict on the testimony of one witness alone when the jury believes the one
witness beyond a reasonable doubt on each of elements of the offense. See
Standefer, 59 S.W.3d at 179. Although the question was a commitment question, it
was not improper, however, because it met the second and third prongs of the
Standefer test. See id. at 179–83. The second prong, which requires the court to
consider whether the question leads to a valid challenge for cause, is met here
because the State’s question attempts to discover whether any of the prospective
jurors harbor a preexisting bias or prejudice concerning the ability of the jurors to
convict in accordance with the “one witness rule.” See Tex. Code Crim. Proc.
Ann. art. 35.16(b)(3) (Vernon Supp. 2005). As set forth above, a juror who would
require more evidence than necessary to prove a case beyond a reasonable doubt
would be subject to a challenge for cause. Castillo, 913 S.W.2d at 533–34. The
third prong that requires the court to determine whether the question includes only
those facts necessary to test whether a prospective juror is challengeable for cause
is also met here because this question did not include any extraneous details about
appellant’s charged offense. See Standefer, 59 S.W.3d at 182–83.
          We thus hold that the question asked by the State during voir dire that asked
the jurors if they could follow the law that allows a jury to convict on the testimony
of one witness that has established all of the elements of the offense beyond a
reasonable doubt was a proper voir dire question.
          We overrule appellant’s second issue.
Ineffective Assistance of Counsel
          In his third point of error, appellant contends that he was denied effective
assistance of counsel at the guilt or innocence phase of trial when his attorney did
not object to testimony regarding the credibility of J.H.
          To prevail on a claim of ineffective assistance of counsel, the defendant must
show that trial counsel’s performance was deficient and a reasonable probability
exists that the result of the proceeding would have been different. Strickland v.
Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). The first prong of the
Strickland test requires that the defendant show that counsel’s performance fell
below an objective standard of reasonableness. Thompson v. State, 9 S.W.3d 808,
812 (Tex. Crim. App. 1999). Thus, the defendant must prove objectively, by a
preponderance of the evidence, that trial counsel’s representation fell below
professional standards. Mitchell v. State, 68 S.W.3d 640, 642 (Tex. Crim. App.
2002). The second prong requires that the defendant show a reasonable probability
that, but for counsel’s unprofessional errors, the result of the proceeding would have
been different. See Strickland, 466 U.S. at 694, 104 S. Ct. at 2068; Thompson, 9
S.W.3d at 812. Because the reviewing court must, however, indulge a strong
presumption that counsel’s conduct falls within the wide range of reasonable
professional assistance, the defendant must overcome the presumption that, under
the circumstances, the challenged action “might be considered sound trial strategy.”
Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. Any allegation of ineffectiveness
must be firmly founded in the record, which must demonstrate affirmatively the
alleged ineffectiveness. Thompson, 9 S.W.3d at 813 (citing McFarland v. State, 928
S.W.2d 482, 500 (Tex. Crim. App. 1996)). We will not speculate to find trial
counsel ineffective when the record is silent on counsel’s reasoning or strategy. 
Robinson v. State, 16 S.W.3d 808, 813 n.7 (Tex. Crim. App. 2000). In rare cases,
however, the record can be sufficient to prove that counsel’s performance was
deficient, despite the absence of affirmative evidence of counsel’s reasoning or
strategy. Id.
          It is generally improper for a witness to offer a direct opinion as to the
truthfulness of another witness and such opinion is therefore inadmissible evidence. 
See Schutz v. State, 957 S.W.2d 52, 59 (Tex. Crim. App. 1997) (holding testimony
that complainant did not exhibit evidence of fantasizing, that manipulation was less
likely explanation for complainant’s allegations, and that complainant’s allegations
were not result of fantasy constituted direct comments on truth of allegations). This
type of testimony is inadmissible “because it does more than ‘assist the trier of fact
to understand the evidence or to determine a fact in issue;’ it decides an issue for the
jury.” Yount v. State, 872 S.W.2d 706, 709 (Tex. Crim. App. 1993). This rule
applies to expert and lay witness testimony alike. Arzaga v. State, 86 S.W.3d 767,
776 (Tex. App.—El Paso 2002, no pet.); Fisher v. State, 121 S.W.3d 38, 41 (Tex.
App.—San Antonio 2003, pet. ref’d). 
          The record shows that Melvina testified without objection that she believed
J.H. when he reported to her that he was abused by appellant, even though she did
not report the abuse to police authorities. The record also shows that Officer Frost
testified that she determines whether a victim of a sexual offense is believable by
looking for consistency, details, and prior exposure to sexual experiences, and that
no alarms were raised during her interview with J.H. Appellant did not obtain a
motion for new trial hearing, and no direct evidence in the record establishes why
appellant’s attorney did not object at trial to the testimony complained of on appeal. 
We must, therefore, presume that counsel had a plausible reason for his actions. 
Thompson, 9 S.W.3d at 814. From our review of the record, we cannot conclude that
there could be no plausible reason for counsel’s decision not to object to this
testimony at trial. See Robinson, 16 S.W.3d at 813 n.7. We conclude that appellant
has not met his burden of proving ineffective assistance of counsel by a
preponderance of the evidence. See Mitchell, 68 S.W.3d at 642.
          We overrule appellant’s third point of error.
Conclusion
          We affirm the judgment of the trial court.
 
 
                                                             Elsa Alcala
                                                             Justice
 
Panel consists of Justices Nuchia, Jennings, and Alcala.
 
Justice Jennings, dissenting.
 
Publish. Tex. R. App. P. 47.2(b)